346 So.2d 569 (1977)
Raymond O. McDONALD, Jr., et al., Petitioners,
v.
DEPARTMENT OF BANKING AND FINANCE, State of Florida, Respondent.
No. DD-375.
District Court of Appeal of Florida, First District.
May 10, 1977.
Rehearing Denied May 31, 1977.
*573 J. Riley Davis, Wilbur E. Brewton, and Clyde M. Taylor, Jr., of Taylor, Brion, Buker & Greene, Tallahassee, for petitioners.
Edward E. Kuhnel, Gen. Counsel, and William B. Corbett, Jr., Asst. Gen. Counsel, Tallahassee, for respondent.
SMITH, Judge.
Petitioners unsuccessfully applied to the Department of Banking and Finance, Division of Banking, for authority to organize and operate First Bank of Port Richey. Here they seek judicial review of the Department's final order which denied their application after formal proceedings were conducted under the Administrative Procedure *574 Act (APA), Section 120.57,[1] by a hearing officer of the Division of Administrative Hearings.

ISSUES
We are required to reconcile the competing purposes of two statutes, one substantive, one procedural, which now affect awards of State banking authority. On the one hand, discretionary power to grant or deny banking authority is committed by Section 659.03 to the Department, which by rule has concentrated that power in the Comptroller as agency head. Sections 20.12, 20.05(5), Fla. Admin. Code Rule 3C-10. Section 659.03 restricts the Department's discretion only by requiring, in subsection (1), that "the department shall make an investigation" of the applicants' qualifications[2] and by directing, in subsection (2), that the Department "not approve such application until, in its opinion":
"(a) Public convenience and advantage will be promoted by the establishment of the proposed bank or trust company.
"(b) Local conditions assure reasonable promise of successful operation for the proposed bank or the principal office of the proposed trust company and those banks or trust companies already established in the community.
"(c) The proposed capital structure is adequate.
"(d) The proposed officers and directors have sufficient banking or trust experience, ability and standing to assure reasonable promise of successful operation.
"(e) The name of the proposed bank or trust company is not so similar as to cause confusion with the name of an existing bank.
"(f) Provision has been made for suitable banking house quarters in the area specified in the application." Section 659.03(2).
In counterpoise to that broad grant by Section 659.03, the APA tends to confine the Comptroller's discretion by requiring he accept and act on facts as found by the hearing officer on competent substantial evidence.[3] Here the hearing officer made detailed findings of fact tending to show that petitioners satisfy Section 659.03 standards, concluded that petitioners do satisfy those standards, and accordingly recommended they be granted authority to organize First Bank of Port Richey. The Comptroller's order discarded the hearing officer's findings of fact as not based on competent substantial evidence, substituted other and contrary findings, explained in some measure the Comptroller's policies militating against petitioners' application, and finally denied the application.
The applicants' petition for review asserts the Comptroller erroneously discarded the hearing officer's findings of fact which are supported by competent substantial evidence *575 and erroneously based his decision on improperly substituted findings of fact. The Department urges both that its substituted findings are proper and that a reviewing court must "not substitute its judgment for that of the agency as to the weight of the evidence on any disputed findings of fact." Section 120.68(10). The Department also declares the hearing officer's findings are of little consequence even if accurate, because the Comptroller's discretion must ultimately govern, and a reviewing court "shall not substitute its judgment for that of the agency on an issue of discretion." Section 120.68(12).

AGENCY PROCEEDINGS
In August 1973, applicants McDonald, Blackwood (since replaced by Prentice), Clark, Boyce and Scheer petitioned the Department for authority to organize and operate First Bank of Port Richey near a shopping center on a major highway in Port Richey, Pasco County, Florida. Six banks in the vicinity protested the application on various grounds. On April 24, 1974, State banking examiner Hieronymus, after a joint investigation with a Federal Deposit Insurance Corporation examiner, reported unfavorably to Comptroller Dickinson. Notwithstanding other internal recommendations of disapproval, Comptroller Dickinson on December 20, 1974, entered an order approving petitioners' application on stated conditions. When Comptroller Lewis took office in January 1975, the Department adopted an emergency rule authorizing revocation of conditional approval orders, and Comptroller Lewis revoked the conditional approval granted petitioners. On March 22, 1975, after a further investigation, examiner Hieronymus submitted an updated report reciting need for additional field examination time but recommending Comptroller disapproval of the application on grounds "the opportunity for return on investment of an amount to meet the criteria of the Division of Banking is less than probable," proposed management is inadequate and, because of unfavorable economic conditions, local convenience and needs would not be served by the new bank.
In April 1975, in accordance with Department rules, a "Comptroller's conference" was held where applicants, protestants and others presented evidence and argument. In October 1975, the Comptroller entered an order denying the application on the ground local conditions did not assure reasonable promise of successful operation for the proposed bank, as required by Section 659.03(2)(b). The Comptroller found "the establishment of the proposed bank would promote, to some degree, the public convenience in the area," as required by subsection 2(a), but expressed no conclusion concerning petitioners' satisfaction of subsections 659.03(2)(c) through (f).
Petitioners thereupon requested that formal proceedings be conducted as required by the APA when a party's substantial interests are to be determined and there is a disputed issue of material fact. Section 120.57(1). Litigation ensued in the Leon County circuit court, as a result of which, on January 6, 1976, the court found Comptroller Lewis had agreed to process bank charter applications in accordance with the newly effective APA[4] and ordered formal proceedings under Section 120.57(1).
Comptroller Lewis, though authorized as agency head to conduct formal proceedings under Section 120.57(1), referred the matter to the Division of Administrative Hearings, whose assigned hearing officer, Diane D. Tremor, conducted hearings in April 1976 and entered a recommended order in June. *576 That order made "findings of fact" which we summarize here in the same order that Section 659.03(2) lists the essential standards for granting banking authority:
(a) Public convenience and advantage. The proposed bank is to be located on a busy corner of Ridge Road and U.S. Highway 19 at the Port Richey Shopping Village, near large residential areas and a junior college site. Though the owners of the shopping center are experiencing financial difficulty, the center is 93 percent occupied. Three savings and loan institutions are nearby, but the nearest banks are 2.3 and 3.5 miles from the proposed location. Most of the seven existing banks in the area are closer to each other than the proposed bank would be to them.
(b) Reasonable promise of success. Pasco County is one of Florida's faster growing areas. More than 16,000 persons reside in the 14 square miles constituting the proposed bank's trade area, as compared with the average of 12,000 residents in a typical trade area. Although existing Pasco County banks suffered substantially from the effects of inflation and recession for two years before the April 1975 hearing, economic conditions are "now beginning to pick up" and area banks gained substantial deposits in 1975. Pasco County banks increased deposits 8.1 percent in 1975, as contrasted to substantially poorer performances by banks in Duval, Polk and Hillsborough counties, where the Department nevertheless granted banking authority in 1975. While the proposed bank might operate at a loss in its first year, as is the common experience, projections of both deposits and profits for the second and third years indicate, as former examiner Hieronymus stated on petitioners' cross-examination, a reasonable promise of a profitable operation. No existing bank apprehended adverse effects other than normal competition.
(c) Capitalization. $1,500,000 is adequate, as found by examiner Hieronymus in his reports and testimony.
(d) Management. The proposed officers and directors represent a cross section of the community. Each has prior business experience and three have banking experience with new and established banks. Mr. McDonald, the proposed president and chief executive officer, was executive vice president of a Tampa bank and director of a Lakeland bank and thus was not without experience, as erroneously reported in the Department's original and updated examiner's reports.
(e) Name confusion. Although numerous banks in Florida use the word "First" in their names, the proposed name of First Bank of Port Richey should cause no conflict or confusion with any existing bank.
(f) Facilities. The applicants propose a 14,000 square foot building as a permanent banking facility, built at a reasonable cost, and temporary facilities in a modular unit adjacent to the construction site. "The temporary unit will be leased and will comply with federal security and bonding requirements."
In stating the above "findings of fact," the recommended order also recorded the hearing officer's reason for overruling the Department's objection to admission of petitioners' evidence of improved banking and economic conditions after October 1975, when the Comptroller acted unfavorably on the application:
"This [is] a fact-finding adversary hearing ... to determine the issue of whether petitioner[s] should be granted authority to organize and operate a general banking business at the proposed location; and considering the long delay between the Comptroller's conference, the Comptroller's order of denial and the date of the present hearing, as well as the fact that the Comptroller declined to reach any conclusion as to four of the six criteria required to be met for a charter, the parties were permitted to present all relevant evidence to date concerning the issues in dispute."
On these findings, the hearing officer entered "conclusions of law" stating: (a) the proposed bank would promote public convenience and advantage; (b) local conditions *577 assure reasonable promise of a successful operation and would not adversely affect any existing bank; (c) the proposed capital structure is adequate; (d) the proposed officers and directors have sufficient banking experience and ability to assure reasonable promise of a successful operation; (e) the proposed name would not be confusing and (f) suitable banking house quarters are provided for.
In September 1976 Comptroller Lewis entered a final order rejecting many of the hearing officer's findings of fact as not based on competent substantial evidence, rejecting several of the hearing officer's conclusions of law, and holding (a) the proposed bank would promote to some degree the public convenience in the area; (b) local conditions do not assure reasonable promise of a successful operation; (c) the proposed capital structure is adequate; (d) the proposed officers and directors are not shown to be qualified; (e) petitioners failed to show there would be no confusion between the proposed name of the bank and other existing banks; and (f) there is no substantial competent evidence that the proposed banking quarters would be adequate.
While the Comptroller's order stated that in his opinion the hearing officer erred in considering economic and other circumstances since "the original application or its up-date," the Comptroller's findings did not ignore the improvement in economic conditions between October 1975, when the Comptroller initially acted on the application, and April 1976, when the hearing was conducted.

DISCUSSION
The legislature has committed to the Department and Comptroller wide discretion in determining applications for banking authority. Judicial decisions under prior administrative law recognized the breadth of that discretion. Bay Nat'l Bank & Trust Co. v. Dickinson, 229 So.2d 302, 304 (Fla. 1st DCA 1969); National Bank of Tampa v. Green, 175 So.2d 545 (Fla. 1st DCA 1965). Under prior law the Comptroller's responsibility was to conduct some investigation in the several areas of statutory concern for an applicant's qualifications and then to decide the matter "with discretion." Unless the Comptroller "wholly fail[ed]" to investigate or could be shown by suit for injunction to have acted "capriciously, arbitrarily, fraudulently or in such manner as to amount to a gross abuse of discretion," there was no administrative or judicial remedy either for the applicant whose application was denied or for any protestant. Bay Nat'l, 229 So.2d at 304; National Bank of Tampa, 175 So.2d at 550-51; Dickinson v. Judges of District Court of Appeal, 282 So.2d 168 (Fla. 1973).
The APA does not compromise the Department's ultimate authority over banking applications. Nor does it strip the Comptroller, a constitutional officer who is head of the Department, of the discretion in such matters which is finally his. In three important respects, however, the APA affects the scope and manner of exercise of agency discretion: (1) the APA prescribes the process by which disputed facts are found; (2) it requires that the agency adopt as rules its policy statements of general applicability, requires agency proof of incipient policy not expressed in rules and permits countervailing evidence and argument; and (3) it requires an agency to explain the exercise of its discretion and subjects that explanation to judicial review.
1. When the facts are disputed, Section 120.57(1) prescribes a trial type proceeding to find the facts on which the agency's discretion is permitted to operate.
We recently held that every agency action is "a recognizable rule or an order" under the APA or is "incipiently a rule or order." State ex rel. Dep't of Gen. Serv. v. Willis, 344 So.2d 580, 584 (Fla. 1st DCA 1977). Except when an agency acts by formal rulemaking (Section 120.54) or by declaratory statement concerning the applicability of a statute, rule or order (Section 120.565), all agency action, on appropriate challenge, will mature into an order impressed with characteristics of the APA's Section 120.57.
*578 A party whose substantial interests are or will be affected by agency action is entitled to a Section 120.57 hearing. If there is a "disputed issue of material fact," the agency must provide a trial type hearing upon request "[u]nless waived by all parties." The time and manner of requesting formal proceedings may be governed by agency rules not inconsistent with model rules promulgated by the Administration Commission.[5] Section 120.53(1)(b), 120.54(10); Fla. Admin. Code Rule 28-5.15 (model rule). Formal proceedings must be conducted either by the agency head or, at the agency's election, by a hearing officer of the Division of Administrative Hearings. In this case the Department, no doubt mindful of administrative burdens that would fall on the Comptroller should he personally conduct all formal proceedings on bank applications, requested assignment of a hearing officer.
In consequence, the Department was required to honor the hearing officer's findings of fact unless "not based upon competent substantial evidence." Section 120.57(1)(b)9; Venetian Shores Home & Prop. Own. v. Ruzakawski, 336 So.2d 399 (Fla. 3d DCA 1976). Yet we as the reviewing court are required to sustain the Department's findings of fact  those which petitioners urge were wrongfully substituted  if they are supported by competent substantial evidence. Section 120.68(10). The result is a conundrum: bound as we are to honor agency findings of fact supported by competent substantial evidence, how shall we determine whether the agency, as required, accorded similar respect to the hearing officer's findings?
Judges Learned Hand, Swann and Frank of the Second Circuit addressed the same question in NLRB v. Universal Camera Corp., 179 F.2d 749 (2d Cir.1950). Confronted with NLRB findings rejecting those of an examiner, the court was required by federal law both to respect the Board's substituted findings and to enforce Board respect for the examiner's findings. The court chose to honor the Board's findings without regard for the examiner's. Judge Hand's opinion measured the imbroglio:
"We hold that, although the Board would be wrong in totally disregarding his findings, it is practically impossible for a court, upon review of those findings which the Board itself substitutes, to consider the Board's reversal as a factor in the court's own decision. This we say, because we cannot find any middle ground between doing that and treating such a reversal as error, whenever it would be such, if done by a judge to a master in equity." 179 F.2d at 753.
Reversing, the Supreme Court held that reviewing courts should not become "pinioned between the horns of his [Hand's] dilemma," that they need not choose exclusively between the examiner's findings and the Board's substituted findings. Universal Camera Corp. v. NLRB, 340 U.S. 474, 493, 71 S.Ct. 456, 467, 95 L.Ed. 456, 470 (1951). Justice Frankfurter's opinion for the Court conceded the difficulty of completely reconciling the competing principles, but held it is possible and desirable for a reviewing court to give weight to the examiner's discarded findings while determining whether "substantial evidence" supports the Board's decision. Finding "substantial evidence," the Court held, is not done by mechanically *579 combing the transcript for words and phrases of testimony that corroborate the Board's questioned finding, but rather by considering the whole record, including the examiner's findings. "The substantiality of evidence," Frankfurter stated, "must take into account whatever in the record fairly detracts from its weight." 340 U.S. at 488, 71 S.Ct. at 464, 95 L.Ed. at 467.
Florida's APA does not require that the reviewing court ignore the hearing officer's findings to the extent they are displaced by agency findings. We are therefore free to reconcile the potentially conflicting statutory demands by adopting Universal Camera's standard of judicial review. The Florida APA, like the federal, makes the hearing officer's recommended order part of the record in the reviewing court. Section 120.57(1)(b); 120.68(5)(a). The hearing officer's findings are indisputably part of "the record" in which the APA requires competent substantial evidence to support findings of fact on which agency action depends. Section 120.68(10). There is nothing in our APA, as there was nothing in the federal Act, which "suggests that reviewing courts should not give to the [hearing officer's] report such probative force as it intrinsically commands," notwithstanding that the agency has substituted contrary findings. 340 U.S. at 495, 71 S.Ct. at 468, 95 L.Ed. at 471.
In determining whether substantial evidence supports the agency's substituted findings of fact, a reviewing court will naturally accord greater probative force to the hearing officer's contrary findings when the question is simply the weight or credibility of testimony by witnesses, or when the factual issues are otherwise susceptible of ordinary methods of proof, or when concerning those facts the agency may not rightfully claim special insight. Within Section 659.03(2), the hearing officer's findings respecting the standards in subsections (a) and (f)  the "public convenience and advantage" of the bank and the suitability of its proposed banking house  would carry relatively greater probative force in determining the substantiality of evidence supporting contrary findings by the agency.
At the other end of the scale, where the ultimate facts are increasingly matters of opinion and opinions are increasingly infused by policy considerations for which the agency has special responsibility, a reviewing court will give correspondingly less weight to the hearing officer's findings in determining the substantiality of evidence supporting the agency's substituted findings. The issues framed by subsection (b) and (d) of Section 659.03(2)  "reasonable promise of successful operation" and the skill of proposed management  are, compared to the others, of that character.
Thus, the substantiality of evidence supporting an agency's substituted finding of fact depends on a number of variables: how susceptible is the factual issue to resolution by credible witnesses and other evidence, how substantially the hearing officer's discarded findings are supported by such evidence, how far the factual issue tends to be one of opinion, how completely agency policy occupies a field otherwise open to different opinion. Judicial review of the Department's substituted findings of fact is therefore inseparable from review of agency "determinations of ... policy within the agency's exercise of delegated discretion." Section 120.68(7).
2. Sections 120.52(14) and .54 require that agency policy statements of general applicability be adopted as rules and Section 120.57 requires proof of incipient agency policy not expressed in rules and subjects it to countervailing evidence and argument.
"No agency has inherent rulemaking authority," Section 120.54(4), but the Department has explicit power to implement by rule any provision of the banking code. Section 658.05(1).
As required by the APA's Section 120.53(1), the Department has adopted rules of procedure describing its organization, the general course and method of its operations, the nature and requirements of its formal and informal procedures on applications for banking authority, and procedures for presentation *580 of evidence and arguments on disputed facts, law and policy. Fla. Admin. Code Rules 3-3, 3C-10. Proceedings on petitioners' application for banking authority followed the Department's prescribed informal procedures through investigation, hearing, and "final" decision, all before petitioners requested formal proceedings under Section 120.57(1). Without objection, the hearing officer conducted the formal proceedings in accordance with the model rules adopted by the Department of Administration. Fla. Admin. Code Rule 28-5.22 et seq.
The APA's rulemaking provisions affect the substance of agency policy as well as agency procedures. For the term "rule" is defined by Section 120.52(14) to include
"... each agency statement of general applicability that implements, interprets, or prescribes law or policy... ."
So defining "rule," Florida's APA has the purpose, uniformly endorsed by students of the modern administrative process, of encouraging agencies by rulemaking "to close the gap between what the agency and its staff know about the agency's law and policy and what an outsider can know." K. Davis, Discretionary Justice 102 (1969). The APA does not in terms require agencies to make rules of their policy statements of general applicability, nor does it explicitly invalidate action taken to effectuate policy statements of that character which have not been legitimated by the rulemaking process. But that is the necessary effect of the APA if the prescribed rulemaking procedures are not to be atrophied by nonuse. See Straughn v. O'Riordan, 338 So.2d 832, 834 (Fla. 1976). Compare NLRB v. Wyman-Gordon Co., 394 U.S. 759, 764, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709, 714 (1969).[6] Therefore we have recognized the availability of an administrative remedy against any agency policy statement of general applicability which has not been adopted through rulemaking. Section 120.56; Dep't of Administration v. Stevens, 344 So.2d 290 (Fla. 1st DCA, 1977). A remedy is available also in Section 120.57 proceedings affecting a party's substantial interests. State ex rel. Dep't of Gen. Serv. v. Willis, 344 So.2d 580, 591-92 (Fla. 1st DCA 1977). The APA thus impels agencies to "confine their own discretion" by "moving from vague standards to definite standards to broad principles to rules." K. Davis, supra, at 55. The six standards for banking authority prescribed by Section 659.03(2) are susceptible to implementation and interpretation by Department rules, but as yet the Department has none.
The APA does not chill the open development of policy by forbidding all utterance of it except within the strict rulemaking process of Section 120.54. Agencies will hardly be encouraged to structure their discretion progressively by vague standards, then definite standards, then broad principles, then rules if they cannot record and communicate emerging policy in those forms without offending Section 120.54. The folly of imposing rulemaking procedures on all statements of incipient policy is evident. In the final order, for example, the comptroller expressed a fragment of policy in this way:
"To insure a reasonable promise of successful operation, the total state banking picture must be taken into consideration in considering a bank application. Consideration of a charter for a new state bank cannot exclude the economic health of the state-wide banking system because once chartered the new bank becomes a part of that system and assumes some of the characteristics of the larger body."
In a pedantic sense, the Comptroller's statement is a "rule"  and therefore an illicit one  because it has the appearance of an

*581 "agency statement of general applicability that implements, interprets, or prescribes law or policy ...." Section 120.52(14).
It would immediately stifle Department policymaking and ultimately destroy the APA to label the Comptroller's statement a "rule" concerning which Section 120.54 requires notice of its intended utterance, an estimate of its economic impact, publication in Florida Administrative Weekly, public debate, review by the Administrative Procedures Committee and finally publication in the Florida Administrative Code. Given such strictures on policy utterance, public information concerning agency purpose would vanish. Agency orders under Section 120.57 and agency declaratory statements of the applicability of its rules, Section 120.565, would tend to become arid, unreasoning edicts because explanation and interpretation, without rulemaking, would be held fatal to the intended action.
Florida's APA does not have those bizarre effects. For the Section 120.54 rulemaking procedures are imposed only on policy statements of general applicability, i.e., those statements which are intended by their own effect to create rights, or to require compliance, or otherwise to have the direct and consistent effect of law. E.g., Stevens, 344 So.2d at 296. That is the meaning of the essentially identical "rule" definition in the federal Administrative Procedure Act,[7] which "obviously could be read literally to encompass virtually any utterance by an agency... ." Pacific Gas & Elec. Co. v. FPC, 164 U.S.App.D.C. 371, 506 F.2d 33, 37 (1974) (guidelines order held not a rule because the agency did not intend it to operate of its own effect, but subject to modification by adjudications). See also Lewis-Mota v. Sec'y of Labor, 469 F.2d 478, 482 (2d Cir.1972) (policy statement held a rule because it "changed existing rights and obligations"); Texaco, Inc. v. FPC, 412 F.2d 740 (3d Cir.1969) (order similarly held invalid rulemaking); Airport Comm'n of Forsyth Co. v. CAB, 300 F.2d 185, 188 (4th Cir.1962) (public statement of policy held guide to future planning, not a "rule which the public is required to obey or with which it is to avoid conflict").
While the Florida APA thus requires rulemaking for policy statements of general applicability, it also recognizes the inevitability and desirability of refining incipient agency policy through adjudication of individual cases. There are quantitative limits to the detail of policy that can effectively be promulgated as rules, or assimilated;[8] and even the agency that knows its policy may wisely sharpen its purposes through adjudication before casting rules. Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv.L.Rev. 921, 927 (1965). The Law Revision Council, sponsor of the proposed 1974 APA, had no intention of building an impenetrable wall between policymaking and adjudication. On the contrary, the APA reflects the Council's conviction that:
"In fact, agency proceedings frequently affect individual rights and create general policy at the same time, so that they *582 partake of adjudication and rule-making at the same time."[9]
Section 120.53(1)(c) requires, independently of 120.54 rulemaking provisions, agency procedures for argument of policy issues before the agency. In informal proceedings affecting a party's substantial interests, the agency is required to state and entertain challenges to the "policy grounds" for its intended action. Section 120.57(2)(a)1, 2. The agency's final order in 120.57 proceedings must describe its "policy within the agency's exercise of delegated discretion" sufficiently for judicial review. Section 120.68(7). By requiring agency explanation of any deviation from "an agency rule, an officially stated policy, or a prior agency practice," Section 120.68(12)(b) recognizes there may be "officially stated agency policy" otherwise than in "an agency rule"; and, since all agency action tends under the APA to become either a rule or an order, such other "officially stated agency policy" is necessarily recorded in agency orders.[10] All such rules and orders, catalogued by a subject-matter index, must be made available for inspection and copying by the public in an ever-expanding library of precedents to which the agency must adhere or explain its deviation. Sections 120.53(2), 120.68(12)(b).
The APA's provision for agency policymaking by adjudication has significant effect on Section 120.57(1) proceedings, such as those before us now, in which a party's substantial interests are determined and there are disputed issues of material fact. Because the agency's final order in such proceedings must explicate nonrule policy, the hearing officer's recommended order must do the same:
"The hearing officer shall complete and submit ... a recommended order consisting of his findings of fact, conclusions of law, interpretation of administrative rules ... and any other information required by law or agency rule to be contained in the final order." Section 120.57(1)(b)8 (emphasis added).
It follows that both the agency's final order and the hearing officer's recommended order must in all respects  in dealing with emerging agency policy as well as in finding the facts  have a predicate in the record, namely, the "short and plain statement of the matters asserted by the agency and by all parties," the evidence, the argument, the "proposed findings of facts and orders" and the exceptions thereto. Section 120.57(1)(b) 2 d, 4, 5. See Tamiami Trail Tours, Inc. v. Bevis, 316 So.2d 257, 260 (Fla. 1975).
In the case before us, the Department properly adduced testimony of the Director of its Division of Banking evaluating the petition and to a limited extent expressing Department rationale for disapproving it. To the extent the agency may intend in its final order to rely on or refer to emerging policy not recorded in rules or discoverable precedents, Section 120.53(2), that policy must be established and may be challenged by proof. We recently approved, in another case, a hearing officer's order authorizing prehearing discovery of any Department nonrule criteria for determining statutory qualifications for authority to establish a savings and loan institution. Lewis v. Life Sav. and Loan Ass'n, 342 So.2d 1031 (Fla. 1st DCA 1977).
Thus the APA infuses Section 120.57(1) proceedings with concern for agency policy as well as for facts and law. The hearing officer, called to preside because the agency head is unavailable and factual issues must be resolved, is also charged to record, recommend and critique agency policy as it is revealed in the record. While concerning policy matters the hearing officer's recommended order does not carry the authority attending its findings of fact, the *583 hearing officer's duty to respond to the evidence in that way cannot fail to promote responsible agency policymaking. The hearing officer's function creates agency incentives for rulemaking, which as far as it goes displaces proof and debate of policy in 120.57 proceedings;[11] encourages an agency to fully and skillfully expound its nonrule policies by conventional proof methods; and, in appropriate cases, subjects agency policymakers to the sobering realization their policies lack convincing wisdom, and requires them to cope with the hearing officer's adverse commentary. Thus in Section 120.57(1) proceedings the hearing officer does not merely find the facts and supply the law, as would a court. The hearing officer "independently serves the public interest by providing a forum to expose, inform and challenge agency policy and discretion." Willis, 344 So.2d at 591. See also Gifford, Decisions, Decisional Referents, and Administrative Justice, 37 Law and Contemp.Prob. 3, 29 (1972).[12] In this respect, perhaps more than in any other, "the Florida legislature has drawn upon the legal thinking and experience of the 1970's, rather than the 1940's when the last administrative procedure acts were conceived." Kennedy, A National Perspective of Administrative Law and the Florida Administrative Procedure Act, 3 Fla.St.U.L.Rev. 65 (1975).
3. Section 120.57 requires agency explanation of its discretionary action affecting a party's substantial interests, and Section 120.68 subjects that explanation to judicial review.
Section 120.57 proceedings, in which the agency's nonrule policy is fair game for a party's challenge both in the public and in his private interest, concludes by a final agency order which explicates "policy within the agency's exercise of delegated discretion," explains any deviation from "an agency rule, an officially stated policy, or a prior agency practice," and, in a "licensing" proceeding such as this one, "state[s] with particularity the grounds or basis for the issuance or denial" of the license. Sections 120.57(1)(b)9, 120.57(2)(a) 1 and 2, 120.60(2), 120.68.
Judicial review proceedings under Section 120.68 similarly press for crystalization of agency discretion. The court's responsibility is to allow the agency full statutory range for its putative expertise and specialized experience. But, to the extent that agency action depends on nonrule policy, Section 120.68 requires its exposition as a credential of that expertise and experience. The displaced findings of hearing officer Tremor lessen in probative force as the "facts" blur into opinions and opinions into policies, and the Department's power to substitute findings based on record evidence correspondingly increases. But the Department's duty of exposition also increases. The final order must display the agency's rationale. It must address countervailing arguments developed in the record and urged by a hearing officer's recommended findings and conclusions or by a party's written challenge of agency rationale in informal proceedings, or by proposed findings submitted to the agency by a party. Sections 120.57(1)(b)4, .57(1)(b)9, .57(2)(a)2, .59(2), Stuckey's of Eastman, Ga. v. Dep't of Transportation, 340 So.2d 119 (Fla. 1st DCA 1976); Automotive Parts and Acc. Ass'n v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968); Int'l Harv. Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 651 (1973) (concurring opinion); Assoc. Indus. of N.Y.S., Inc. v. U.S. Dep't of Lab., 487 F.2d 342, *584 354 (2d Cir.1973); L. Jaffe, Judicial Control of Administrative Action 613 et seq. (1965); K. Davis, Discretionary Justice 103-06; K. Davis, Administrative Law Treatise 579 et seq. (1970 Supp.); Gifford, supra, 37 Law & Contemp.Prob. at 21 et seq.[13] See also Reporter's Comments on Proposed Administrative Procedure Act, p. 20 (3/9/74):
"Three due process checks to prevent arbitrary agency action are the requirements that reasons be stated for all action taken or omitted, that reasons be supported by `the record', and that specific judicial review procedures allow the courts to remedy defects of substance."
Failure by the agency to expose and elucidate its reasons for discretionary action will, on judicial review, result in the relief authorized by Section 120.68(13): an order requiring or setting aside agency action, remanding the case for further proceedings or deciding the case, otherwise redressing the effects of official action wrongfully taken or withheld, or providing interlocutory relief.
Having in mind the APA's purposes concerning findings of fact, rulemaking and evidentiary exposure of agency policy, and judicial review of the exposition of agency discretion, we turn to the Department order at hand.
The hearing officer's decision to permit evidence of circumstances as they existed at the time of the hearing was correct. The agency may appropriately control the number and frequency of amendments to licensing applications and may by rule prevent substantial amendment of the application in midproceeding.[14] But the hearing officer or agency head conducting Section 120.57 proceedings should freely consider relevant evidence of changing economic conditions and other current circumstances external to the application. Section 120.57 proceedings are intended to formulate final agency action, not to review action taken earlier and preliminarily.
Public convenience and advantage. The Department did not contest, either before the Section 120.57 proceedings or in its final order, that the proposed First Bank of Port Richey would promote public convenience and advantage to the locale. Section 659.03(2)(a).
Reasonable promise of success. The final order states that local conditions do not assure reasonable promise of a successful operation for First Bank of Port Richey. Because the matter in issue is less one of fact than of opinion which is highly charged with policy considerations for which the Department is responsible, the hearing officer's discarded findings of fact have comparatively little weight in our determination whether substantial competent evidence supports the Department's substituted findings. The Department's order emphasizes marginal economic conditions in western Pasco County, unemployment rates, delinquent loan rates and other economic factors. The record contains substantial testimony supporting those findings of the Department concerning "reasonable promise of successful operation." Yet in two respects the Department's final order is insufficient. The order does not explain the apparent inconsistency in the Department's 1975 decisions on banking applications in counties having less favorable deposit rates than Pasco, as recorded in the hearing officer's recommended order:
"The February, 1976, Comparative Figures Report published by the Florida *585 Bankers Association, which is relied upon in part by respondent in determining whether to grant banking charters, shows Pasco County to have an 8.1 percent increase in deposits from 1974 to 1975 year ends. Since January of 1975, respondent has granted bank charters to banks located in Duval County with a deposit growth of minus .1%; in Polk County with a deposit growth of 1.5%; and in Hillsborough County with a deposit growth of minus 1.5%."
And, after brushing aside the testimony of former bank examiner Hieronymus that Pasco County conditions in 1975 would produce a reasonable promise of profit for the proposed bank, the Department's final order stated simply and without elucidation:
"... It does not follow that the proposed bank would be assured a reasonable promise of successful operation" (emphasis added).
In these respects the Department's final order does not sufficiently explicate "policy within the agency's exercise of delegated discretion" and explain its deviation from prior agency practice. Sections 120.68, 659.03(2)(b).
Capitalization. Here the recommended and final orders do not conflict, and the Department does not contend that the proposed capitalization of First Bank of Port Richey is inadequate. Section 659.03(2)(c).
Management. Although the competence of proposed management is an issue concerning which the Department's putative expertise and experience should carry great weight, neither the Department nor any protestant adduced substantial evidence on this issue contrary to the hearing officer's finding of fact, which was supported by competent substantial evidence. One significant statement in the Department's final order, to the effect that a proposed officer has "not done a satisfactory job in running" another bank, was based entirely on hearsay testimony which standing alone is incompetent to support the Department's finding. Section 120.58(1) (a).[15] The Department has no rules implementing the statutory standard and it has set forth no nonrule policy indicating, on this record, the inadequacy of petitioners' proposed management and directors. Section 659.03(2)(d).
Name confusion. Some testimony by the Director of the Division of Banking tends to suggest confusion in use of the word "First" in a banking name. But there is no competent substantial evidence in the record tending to show that the name "First Bank of Port Richey" would produce perceptibly more or different confusion than already exists. The conflict between the hearing officer's recommended order and the Department's final order is not essentially one of fact, but one of policy. If the Comptroller's purpose is to establish as policy that no bank shall be now authorized to use "First" in its name because of likely confusion, that is a policy statement of general applicability which must be subjected to rulemaking under Section 120.54. The Department's order states:
"... I am unable to agree with the hearing officer's conclusion that the applicants carried their burden of proof relating to the lack of confusion between the name of the proposed bank and any existing bank for the reason that the hearing officer's conclusion on this point is not supported by competent substantial evidence."
The Department's observations concerning the proposed name are insufficient to justify rejecting the hearing officer's recommended order and denying the petition. Section 659.03(2)(e).
Facilities. There is competent substantial evidence supporting the hearing officer's findings concerning the adequacy of the proposed banking quarters. The testimony and reports of examiner Hieronymus found no objection to the proposed quarters. Yet the Department's final order discarded *586 the hearing officer's findings of fact and concluded they were unsupported by competent substantial evidence. The Department was again in error. Again, the Department has offered no evidence, rule or reason which overcomes the natural probative effect of the uncontradicted proof accepted by the hearing officer. Section 659.03(2)(f).
The stated deficiencies in the Department's final order require it be vacated. Yet it does not follow that petitioners must in all events be granted the banking authority they seek. Section 659.03(2) forbids the Department to approve a banking application if in its opinion even one of the six criteria is not met. Further consideration of the factors prescribed by subsections (a), (c), (d) and (f) is foreclosed by the absence of record evidence which might justify the Department in discarding the hearing officer's recommended findings. Further consideration in this proceeding of the subsection (e) factor  name confusion  is foreclosed by the absence of a Department rule. On this record the only potential ground for denying the petition is subsection (b), which requires that local conditions assure reasonable promise of successful operation for the proposed bank and those already established. On the existing record, the case will be remanded to the Department "for further examination and action within the agency's responsibility." Section 120.68(11), Florida Statutes (Supp. 1976).
The order of which review is sought is vacated and the proceeding REMANDED.
RAWLS, Acting C.J., and McCORD, J., concur.
NOTES
[1] Florida statutory citations are to Florida Statutes (1975) and to APA amendments in Florida Statutes (Supp. 1976).
[2] The character, reputation, financial standing and motives of the organizers, incorporators and subscribers in organizing the proposed bank or trust company.
"(b) The need for banking or trust facilities or additional banking or trust facilities, as the case may be, in the community where the proposed bank or the principal office of the proposed trust company is to be located, giving particular consideration to the adequacy of existing banking or trust facilities and the need for further banking or trust facilities in the locality.
"(c) The present and future ability of the community to support the proposed bank or the principal office of the proposed trust company and all other existing banking or trust facilities in the community.
"(d) The character, financial responsibility, banking experience, and business qualifications of the proposed officers.
"(e) The character, financial responsibility, business experience, and standing of the proposed stockholders and directors." Sec. 659.03(1).
[3] Sec. 120.57(1)(b)9: "The agency in its final order may reject or modify the conclusions of law and interpretation of administrative rules in the recommended order, but may not reject or modify the findings of fact unless the agency first determines from a review of the complete record, and states with particularity in the order, that the findings of fact were not based upon competent substantial evidence... ."
[4] While we are not entirely informed concerning the circuit court litigation, it apparently foreclosed reliance by the Comptroller on the 1961 APA, which continued to govern disposition of adjudicative proceedings pending before January 1, 1975, absent "the consent of all parties and the agency" to 1974 APA procedures. Section 120.72(2), Fla. Stat. (1975); Lewis v. Judges of District Court of Appeal, 322 So.2d 16 (Fla. 1975). Comptroller Lewis' letter to petitioners on January 17, 1975, revoking the conditional approval granted by Comptroller Dickinson, stated: "Future activity of the Department of Banking and Finance, and more particularly the Division of Banking will be handled to comply with the new Florida Administrative Procedure Act, Chapter 120, Florida Statutes."
[5] The Department's rules concerning formal and informal proceedings do not prescribe the time and manner of requests for or waiver of formal § 120.57(1) proceedings. As in many other cases under the relatively new APA, the request here for § 120.57(1) formal proceedings came after the agency's informal decision-making process ran its course and a "final" decision was deliberated and announced by the Comptroller. As a result, the ensuing § 120.57(1) proceedings took on the misleading appearance of reviewing rather than formulating agency action. While the APA permits an agency so to plow the same ground twice, once before and again after § 120.57(1) proceedings, neither the APA nor the model rules requires it. We do not decide the point here, but no reason appears why agency rules could not require parties to request or waive formal § 120.57(1) proceedings before the agency has acted informally, when it becomes evident that substantial interests will be affected and there are factual issues. In the normal course of a banking application proceeding those circumstances will appear at or before the Comptroller's conference.
[6] "The rule-making provisions of that [federal] Act, which the Board would avoid, were designed to assure fairness and mature consideration of rules of general application... . They may not be avoided by the process of making rules in the course of adjudicatory proceedings. There is no warrant in law for the Board to replace the statutory scheme with a rule-making procedure of its own invention."
[7] 5 U.S.C. § 551(4) (1970): "`rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy... ." The federal APA excepts an agency's "general statements of policy" from rulemaking requirements and requires only their publication in the Federal Register or other public availability. 5 U.S.C. §§ 552(a), 553(b)(A) (1970). The Florida APA contains no separate category so labeled, but simply disregards as legally insignificant, however helpful it may be as public notice, an agency statement of purpose or policy which is neither rule nor order. The Comptroller's recent public declaration of a moratorium on new grants of banking authority, pending action on certain legislation affecting the Comptroller's duties, was such a statement. The Florida Times-Union, Mar. 23, 1977, p. B-1, Mar. 24, 1977, p. B-1 (Florida edition). See Parker, The Administrative Procedure Act: A Study in Overestimation, 60 Yale L.J. 581, 598 (1951).
[8] The APA requires Department of State efforts to reduce the "number and bulk" of rules and to remove "redundancies and unnecessary repetitions." Section 120.55(1)(a).
[9] Reporter's Comments on Proposed Administrative Procedure Act, p. 6 (3/9/74). See also Lewis v. Judges of District Court of Appeal, 332 So.2d 16, 19 (Fla. 1975).
[10] Willis, supra, 344 So.2d at 584. In Pacific Gas, supra, the court regarded the FPC's public statement of a "policy" as "merely announc[ing] the general policy which the Commission hopes to establish in subsequent proceedings." 506 F.2d at 41.
[11] See Price Wise Buying Group, Bay Area Co-op. v. Nuzum, 343 So.2d 115 (Fla. 1st DCA 1977), holding that an agency cannot, except by Section 120.54 proceedings, discard and effectively repeal a rule regularly adopted.
[12] "[T]he exposure of an official's decisional referents to the critical scrutiny of others may disclose the inadequacy of those referents and create pressures to bring about their change. This type of constraint upon agency action will not tend to be limited  as is judicial review  to overseeing the good faith of agency policy choices. Rather, exposure of the agency's decisional referents to the critical scrutiny of others possesses a potential ... for improving the degree of objective rationality of agency decisions."
[13] Judicial review thus aims not at displacing agency discretion but at requiring, as a condition of its exercise, a reasoned explanation of it. "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." L. Brandeis, Other People's Money 92 (1914).
[14] The Department's Rule 3C-10.02(5) authorizes one amendment to an application for banking authority "at any time prior to 10 days before the meeting of the general public is held" and otherwise only by leave of the department. The need for other material changes, including changes in the board of directors, location and fixed asset proposals, may require a new application. Fla. Admin. Code Rule 3C-10.02(5).
[15] "Hearsay evidence may be used for the purpose of supplementing or explaining other evidence, but it shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions. This paragraph applies only to proceedings under s. 120.57."