## STATE OF FLORIDA DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES v ISAM DAA'S d/b/a SUNRISE GROCERIES

Case No. 86-0802

State of Florida, Division of Administrative Hearings

December 17, 1987

### APPEARANCES OF COUNSEL

**Regina L. Morante,** District VI Legal Counsel for petitioner.

**Paul S. Buchmann** for respondent.

### OPINION OF THE COURT

DIANE A. GRUBBS, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, a formal hearing was held in this cause on June

3, 1987, in Tampa, Florida, before Diane A. Grubbs, a Hearing Officers with the Division of Administrative Hearings.

## ISSUE

Whether respondent should be disqualified from participating as a vendor in the Supplemental Food Program for Women, Infants and Children, known as the WIC Program.

## BACKGROUND

In December, 1985, the respondent received a letter from petitioner proposing to disqualify respondent from the WIC Program for a period of three years. The letter stated that the proposed disqualification was due to overcharges on WIC checks. By Petition for Formal Proceedings dated December 30, 1985, respondent requested a formal hearing pursuant to Section 120.57(1), Florida Statutes, asserting that he had not committed acts supporting the sanction proposed by petitioner. On March 7, 1986, the matter was referred to the Division of Administrative Hearings for further proceedings.

At the hearing petitioner presented the testimony of Maria Pelegrina, WIC Coordinator for Hillsborough County; Analina Micheletti, Senior Clerk with the Hillsborough County WIC Program; John Harrison, Director of Retail Operations for the Florida WIC Program; Lenore Brantley, a WIC investigator; and Sandy Kirkover, an employee of HRS in the WIC Program. Petitioner's exhibits 1-11 were admitted into evidence. Respondent presented the testimony of Isam Daa's and entered one exhibit into evidence.

Prior to hearing the parties filed a prehearing stipulation which included stipulated facts and a statement of issues of law on which the parties agreed. However, most of the statements included under issues of law are statement of fact and, therefore, are included as part of the findings of fact in this order.

Both parties have filed proposed findings of fact and conclusions of law. Rulings on each of the proposed findings of fact are included in the Appendix to this order.

## FINDINGS OF FACT

1. The Special Supplemental Food Program for Women, Infants and Children (WIC Program) is funded by the United States Department of Agriculture under the Child Nutrition Act, Public Law No. 95-626. All funding for the WIC Program is federal; no state funds are used. The Department of Health and Rehabilitative Services (HRS) is the

state health agency which is authorized to administer the WIC Program in Florida.

2. The United States Department of Agriculture has promulgated regulations relating to the WIC Program which are set forth in 7 CFR Section 246.1 *et sez.* Among these regulations is the following requirement:

> The State agency shall establish policies which determine the type and level of sanctions to be applied against food vendors, based upon the severity and nature of the Program violations observed, and such other factors as the State agency determines appropriate. . . . 7 CFR 246.12(k)(1).

Although HRS has established policies prescribing the type and level of sanctions to be applied, which are set forth in HRS Manual No. 150-24, dated May 1, 1983, and HRS Manual No. 150-24A, dated January 24, 1986, none of the policies have been promulgated as rules adopted pursuant to Chapter 120, Florida Statutes. Indeed, HRS has promulgated no rules relating to the WIC Program.

3. The WIC Program provides certain important foods to pregnant women, infants and children. Program participants are examined by health professionals who determine the need for supplemental food and nutritional guidance. The participants receive checks for specific kinds and amounts of nutritious foods. The checks are redeemed at grocery stores that are approved by HRS. A participating grocer, or vendor, must meet certain qualifications to participate in the program and must signed an agreement with HRS. The agreement expires at the end of each year and a new agreement is signed.

4. A WIC check is similar to other types of checks and is redeemed by the vendor simply by depositing the check in his bank account. However, there are restrictions on the use of a WIC check. A WIC check can be used only to purchase the items listed on the face of the check. When a WIC check is presented for the purchase of items, the vendor must total the prices for the food listed on the check separately from any other food being purchased, ensuring that only the exact types and amounts of food listed on the check are included. The vendor then fills in the exact amount of the purchase on the check, and the customer signs the check.

5. On March 21, 1984, HRS first contacted Sunrise Grocery in relation to its application to become a qualified vendor. At the time the owner of Sunrise Groceries was Albert Daa's, respondent's father. At the time of this visit, an application was filled out, and the rules and regulations set forth in HRS Manual No. 150-24 were explained. It was

206

noted that the store lacked the minimum inventory of WIC foods. Another visit was made on April 20, 1984, at which time the store apparently reapplied for participation in the WIC Program. The store was subsequently qualified as a WIC Program vendor.

6. On May 9, 1984, another visit was made to the store for the purpose of training. The rules and regulations, program procedures, and sanctions for program abuses were explained. The owner of Sunrise Groceries at this time was Albert Daa's and he signed this contact report.

7. On September 20, 1984, HRS conducted a Vendor Compliance Review. The purpose of a Vendor Compliance Review is to ensure that the vendor understands WIC Program requirements and the obligations of a WIC vendor. The respondent, Isam Daa's, signed the report as the owner of the store. One of the requirements specifically discussed with respondent was the requirement that WIC checks not be written for amounts exceeding the actual shelf price of the food purchased. On December 11, 1984, HRS again visited Sunrise Groceries to discuss certain check redemption problems. Again, the consequences of overcharging were discussed. Respondent signed the report.

8. On December 19, 1984, the respondent, as the owner and authorized representative of Sunrise Groceries, entered into an agreement with HRS effective January 1, 1985 through December 31, 1985, to participate as a vendor in the WIC Program. As part of this agreement, the respondent agreed to process WIC Program food checks in accordance with the terms of the agreement and state and federal WIC Program rules, regulations and policies. Respondent agreed to provide supplemental foods at the current price or at less than the current price charged to other customers. Respondent also agreed to be accountable for the actions of his employees in the utilization of food checks. Respondent and HRS have entered into the same agreement every year since then.

9. On March 27, 1985, the respondent was sent a certified letter from John Harrison, program specialist with the Florida WIC Program. Respondent was advised that the charges on WIC checks deposited by his store had been exceeding the average for Hillsborough County stores by more than two dollars per check. The letter stated the vendors must charge competitive prices for WIC foods and stated that the prices charged by respondent had not been competitive. The letter specifically reminded respondent of the WIC Program requirement that a check may only be written for the total shelf price of the foods received by the customer. The letter informed respondent that his

failure to comply with these or other requirements could result in the disqualification of his store for up to three years.

10. In August of 1985, Mr. Harrison, who was the Senior Compliance Specialist for the WIC Program, received a call from the local agency indicating that there might be a problem with Sunrise Groceries. Further, a computer printout of September 17, 1985, showed that the average check redeemed by Sunrise Groceries was $2.70 over the average check redeemed in Hillsborough County for the same food. Mr. Harrison therefore made the decision to monitor Sunrise Groceries by using HRS investigators posing as clients. The investigators' checks were specially marked and issued for monitoring purposes. Checks were issued to four different investigators who made 14 purchases between the dates of September 20, 1985 and October 8, 1985.

11. The monitoring of vendor stores is performed by each HRS investigator in substantially the same manner. The investigator goes into the store, purchases certain food items with a WIC check, and notes the amount that is written by the cashier on the check. After leaving the store, the investigator records the actual shelf price of each item purchased. The shelf price is the price that is stamped or placed on the item. Each investigator prepares a Monitoring Purchase Report for each check. The report indicates the time and date of purchase and the check used. The report lists the food prescription, the actual items purchased, the shelf prices for those items, and the amount of check. The investigator also records any other observations. Monitoring Purchase Reports are form reports that are routinely prepared by agency investigators in the course of their duties.

12. Investigators Lenore Brantley and Sandy Kirkover testified at the hearing. Ms. Brantley made purchases at Sunrise Groceries on October 2, October 7, and October 8, 1985. On October 2, Ms. Brantley purchased items with a shelf price of $15.50. The amount written on the check was $17.72. On October 7, 1985, Ms. Brantley purchased items that had a shelf price of $13.01. The amount written on the check was $13.56. On October 8, 1985, Ms. Brantley purchased items with a shelf price of $4.16. The amount the cashier wrote on the check was $4.77. Ms. Kirkover visited Sunrise Groceries on September 20, September 25, and September 30, 1985. On September 20, 1985, Ms. Kirkover purchased items totaling $15.65. The amount written on the check was $16.27. On September 25, 1985, Ms. Kirkover indicated that the shelf price of the items purchased was $13.37 and the amount of the check was $13.51. She stated that the shelf price of the cheese was $3.05 a pound but that the cashier rang up $3.19 for the cheese. However, Ms. Brantley's report of October 7, 1985, indicates that the

208

cheese actually cost $3.19. Thus, the amount written on the check was correct. On September 30, 1985, Ms. Kirkover purchased items with a shelf price of $4.15, and the cashier wrote on the check $4.15.

13. Two of the monitoring purchase reports filled out by Ms. Grooms were accompanied by receipts for the groceries purchased with that check. Ms. Grooms used two checks for purchasing items at the same time on October 7, 1985. One check was used to purchase a gallon of whole milk and a half-gallon of milk. The receipt reflects the correct shelf price of those items, $4.16. The check, however, was filled out for $4.71, which would have been the correct price if three half-gallons of milk had been purchased. The other check was for a variety of items, including a gallon and a half of milk. Ms. Grooms purchased one full gallon and one half-gallon. However, the receipt reveals that she was charged for three half-gallons. Further, the receipt shows the total for the purchase of $13.59, yet the check was written for $13.99.

14. From the evidence presented, it is apparent that WIC checks filled out by respondent, or his employees, do not always reflect the actual shelf price of the food purchased. Indeed, from the evidence presented, it is quite clear that overcharging was the rule rather than the exception. Further, in certain cases the overcharging followed the same pattern, indicating that the overcharging was not a result of merely making an error on the price but was intentional. For example, it appeared to be a routine practice for respondent to charge for three half-gallons of milk, when a one gallon and a half-gallon were purchased, resulting in a 55-cent overcharge on each occasion.

15. Mr. Daa's blamed most of the errors on a female cashier who worked for him for about two months. However, two of the three times Ms. Brantley purchased groceries, the cashier was a male. Several of the other reports also indicate that the cashier was a male.

16. On December 4, 1985, respondent received a letter dated November 27, 1985, from petitioner proposing to disqualify respondent from the WIC Program for a period of three years effective January 1, 1986. The letter states that the proposed disqualification "is due to overcharges on WIC checks." No specific factual allegations were made by petitioner in the letter.

17. Sunrise Groceries is a small business operating as a convenience grocery store in an area predominantly inhabited by persons of low income and poverty. The action proposed by petitioner will affect respondent's substantial interests by curtailing his ability to operate his small business.

18. In HRS Manual No. 150-24, dated May 1, 1983, the conse-

209

quences of vendor abuse are set forth. Section 15-17(a)(4) provides as follows:

Vendors will be suspended/disqualified from the WIC Program for a period of not less than one (1) months and not more than three (3) years for:

\* \* \*

(c) charging the participants more for supplemental foods than other customers are charged for the same foods.

Attachment 3 to Chapter 15 sets forth the periods of disqualification to be imposed by HRS as follows:

The periods of disqualification set forth below will be imposed by the State Agency in response to documented cases of Program abuse by vendors; i.e., violations of WIC Program rules and requirements which constitute a breach of the WIC Vendor Agreement. The period of disqualification will depend upon such considerations as the nature and extent of the violations, previous efforts to promote compliance, and hardships for participants that may result from the disqualification of a vendor.

\* \* \*

| Violation | 1st Offense | Maximum Number of Additional Offenses | Maximum Period of Disqualification |
|---|---|---|---|
| \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Charging WIC participants more than the shelf prices of food | Warning | 2 | 1 year |
| \*\*\* | \*\*\* | \*\*\* | \*\*\* |

19. HRS Manual No. 150-24A, dated January 24, 1986, revised the periods of disqualification. Attachment 3 to Chapter 15 states:

The periods of disqualification set forth below may be imposed by the State Agency in response to documented cases of program abuse by vendors . . . . The actual period of disqualification will depend upon such considerations as the nature and extent of the violations, previous efforts to promote compliance, and hardships for participants that may result from the disqualification of a vendor.

| Violation | Period of Disqualification |
|---|---|
| *** | *** |
| Charging WIC participants more than the shelf price of food | 3 years |

20. No specific evidence was presented at the hearing as to whether the disqualification of respondent from the WIC Program would create hardships for participants in the program. However, the WIC check computer print-out entered into evidence established that respondent does a substantial business with program participants. By November 15, 1985, respondent had cashed over 2,000 WIC checks in 1985.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the subject matter and the parties to this proceeding. Section 120.57(1), *Florida Statutes.*

Section 409.026, *Florida Statutes* (1985), set forth certain functions of the Department of Health and Rehabilitative Services as follows:

(1) The department shall conduct, supervise and administer all social and economic services within the states which are or will be carried on by the use of federal or state funds or funds from any source. . . .

(2) The department shall cooperate fully with the United States Government and its agencies and instrumentalities to the end that the department may receive the benefit of all federal financial allotments and assistance possible to carry out the purposes of this chapter.

\* \* \*

(6) The department may:

(a) Accept such duties with respect to social and economic services as may be delegated to it by any agency of the Federal Government or any state, county, or municipal government;

(b) Act as agent of, or contract with, the Federal Government, state government, or any county or municipal government in the conduct and administration of social and economic services activities in securing the benefits of any public assistance that is available from the Federal Government or any of its agencies and in the disburse-

**211**

ment of funds received from the Federal Government, state government, or any county or municipal government for social and economic services purposes within the state; . . .

The WIC Program is authorized by Section 1786 of Title 42, United States Code. Section 1786(c)(2)(A) provides that cash grants shall be made to state agencies for the purpose of administering the program. Section 1786(f)(1) provides that each state must submit a plan of operation and administration to the Secretary of Agriculture (Secretary) to be eligible to receive funds. The plan must include "a description of the food delivery system of the State agency and the method of enabling participants to receive supplemental foods under the program, to be administered in accordance with the standards developed by the Secretary." Section 1786(f)(1)(C)(i). The plan must also contain any other information the Secretary may require. The plan must be approved by the Secretary for the state agency to receive funds. Section 1786(f)(11) directs the Secretary to "establish standards for the proper, efficient, and effective administration of the program."

Part 246, 7 CFR Ch. II (1-1-86 Edition), sets forth the federal regulations implementing § 1786, Title 42. Section 246.3 states in pertinent part as follows:

(b) Delegation to State agency. The state agency is responsible for the effective and efficient administration of the Program *in accordance with the requirements of this part* . . .

(c) Agreement and State Plan. Each State agency desiring to administer the Program shall annually submit a State Plan and enter into a written agreement with the Department for administration of the Program in the jurisdiction of the State agency *in accordance with the provisions of this part.* (e.s.)

Section 426.12 sets forth the design and operational requirements for the food delivery system. Section 426.12(e) requires that only food vendors authorized by the state may redeem WIC checks. Section 246.12(f) requires that all participating food vendors enter into a written contract with the state agency. Section 246.12(f)(2) sets forth certain specifications which must be contained in the food vendor contract agreement, one of which is that

[t]he food vendor shall provide supplemental foods at the current price or at less than the current price charged to other customers.

The above provision was included in the contract entered into by the respondent. As part of the contract respondent also agreed to "[p]rocess WIC Program food checks in accordance with . . . State and

212

Federal WIC Program rules, regulations and policies and applicable law."

Section 246.12(k) of the federal regulations provides as follows:

(k) Participant and vendor sanctions. (1) The State agency shall establish policies which determine the type and level of sanctions to be applied against food vendors, based upon the severity and nature of the Program violations observed, and such other factors as the State agency determines appropriate, such as whether the violation represented repeated offenses over a period of time, whether the offenses represented vendor policy or whether they represented the actions of an individual employee who did not understand Program rules, and whether prior warning and an opportunity for correction was provided to the vendor. Vendor offenses which are subject to sanctions shall include at least the following . . . charging the State or local agency more for supplemental foods than other customers are charged for the same food item. . . .

\* \* \*

(ii) The period of disqualification from Program participation shall be a reasonable period of time, not to exceed three years. The maximum period of disqualification shall be imposed only for serious or repeated Program abuse.

\* \* \*

(iv) Prior to disqualifying a food vendor, the State agency shall consider whether the disqualification would create undue hardships for participants.

HRS Manual 150-24 sets forth the policies of HRS regarding the type and level of sanctions to be applied against food vendors which were in effect at the time of the violations involved in this case.

In his renewed Motion to Dismiss filed at the hearing, and in his proposed conclusions of law, respondent contends, in effect, that sanctions cannot be imposed against him, regardless of his actions, because HRS' policies regarding sanctions were not promulgated as rules in accordance with Chapter 120. Respondent cites to *Perkins v. Dept. of Health and Rehabilitative Services,* 452 So.2d 1007 (Fla. 1st DCA 1984), *McCarthy v. Dept. of Insurance and Treasurer,* 479 So.2d 135 (Fla. 2d DCA 1985), and *McDonald v. Department of Banking and Finance,* 346 So.2d 569 (Fla. 1st DCA 1977) in support of his contention.

Those cases simply have no applicability to the instant proceeding. As stated in *McDonald,* "rulemaking procedures are imposed only on

213

policy statements of *general applicability,* i.e., those statements which are intended by their own effect to create rights, or to require compliance, or otherwise to have the direct and consistent effect of law." *McDonald* at 581. In this case, the policies challenged by respondent did not *of their own effect* create any rights, responsibilities, or penalties. The contract signed by respondent clearly stated that respondent had to "[p]rovide supplemental foods at the current price or at less than the current price charged to other customers." The contract als provided that the "[f]ailure to comply with terms of this agreement may result in disqualification of the Vendor." The federal regulations imposed the same requirement and established the sanctions that could be imposed for violating that requirement.

The *McCarthy* case, cited by respondent, provides an example of a policy statement that was not promulgated as a rule but was, by its own effect, intended to require compliance. In that case the agency attempted to void McCarthy's certification as a fire safety inspector based on a letter issued by the State Fire Marshal which set forth certain requirements that had to be met to be eligible to take the certification exam. McCarthy did not meet those requirements. However, he had taken the certification examination, had passed it, and had become certified. Seventeen months later, the agency attempted to void the certificate because, under the requirements of the letter, McCarthy had not been eligible to take the examination. The court noted that the letter "sets out catagoric requirements as a prerequisite for obtaining certification." The court held that since the letter "had the effect of requiring compliance and was not adopted by the proper rule-making process, it was invalid." *McCarthy* at 137.

In the *Perkins* case, Perkins was disqualified from food stamp eligibility for failure to meet an assigned "workfare" obligation. Chapter 82-211, Laws of Florida, authorized HRS to implement a workfare pilot project in Duval County, and directed HRS to promulgate the rules necessary to implement the workfare project. The law also authorized the imposition of sanctions "according to the rules established by the Secretary [of HRS]." HRS promulgated no rules. Sanctions were established in a handbook disseminated to the project staff. The court held that since the Legislature explicitly required the promulgation of rules to implement workfare, other forms of valid policy-making were precluded.

In this case there is no statute directing HRS to promulgate rules implementing the WIC Program. Indeed, the legislative directive is simply that HRS may act as the agent of, or contract with, the federal government in securing the benefits of any public assistance that is

214

available from the federal government or in the disbursement of funds received from the federal government. Since there is no statute specifically requiring HRS to promulgate rules regarding program violations and sanctions and since the policies regarding violations and sanctions do not, in and of themselves, have the effect of requiring compliance, the failure of HRS to promulgate these policies as rules does not require that this proceeding be dismissed. Indeed, if the HRS policies regarding sanctions to be imposed against vendors were determined to be invalid, respondent would be subject to a greater sanction than authorized by the policy in effect at the time of the violations.

The evidence in this case established that respondent was advised of the consequences of program abuse, including sanctions that could be imposed. These sanctions were set forth in HRS Manual 150-24, Attachment 3. Although the federal regulations permit disqualification of a vendor for a period of up to three years, HRS policy provided for a maximum period of disqualification of one year for charging more than the shelf price of food. The sanction for the first offense was listed as "warning," and the maximum number of "additional offenses" was listed as two.

In the instant case, the evidence established that on more than three separate occasions, the respondent charged more than the shelf price of the food purchased. If each purchase represented a separate offense, respondent would clearly be subject to disqualification. However, HRS' policy requiring a "warning" for the first offense indicates that the vendor must be advised of the offense committed and warned of the consequences of future offenses before the sanction of disqualification is imposed. Because the instant charge is the first time respondent has been accused of committing the offense of charging more than the shelf price of food or, as stated in the letter of November 27, 1985, "overcharges on WIC checks," it must be concluded that the instant charge constitutes the first offense.

The federal regulations provide that the state agency "shall establish policies which determine the type and level of sanctions to be applied against food vendors. . . ." HRS established such policies, and advised the respondent of those policies. Having established by its policy that the sanction for the first offense would be a warning, HRS cannot now disqualify respondent for his first offense.

## RECOMMENDATION

Based on the foregoing findings of fact and conclusions of law, it is

RECOMMENDED that a final order be entered finding that respon-

dent has charged the state more for supplemental foods than charged other customers, in that the amounts respondent filled in on WIC checks were greater than the shelf price of the foods purchased, and warning respondent that any future violations could result in respondent's disqualification as a vendor in the WIC Program.

DONE AND ENTERED this 17th day of December, 1987, in Tallahassee, Leon County, Florida.