353 So.2d 1199 (1977)
GENERAL DEVELOPMENT CORP., Petitioner,
v.
DIVISION OF STATE PLANNING, DEPARTMENT OF ADMINISTRATION, State of Florida, Respondent.
No. CC-118.
District Court of Appeal of Florida, First District.
December 22, 1977.
Rehearing Denied February 8, 1978.
*1202 Parker D. Thomson and Robert T. Wright, Jr. of Paul & Thomson, Miami, for petitioner.
Louis F. Hubener, III, Tallahassee, for respondent.
SMITH, Judge.
General Development Corporation (GDC) petitions for review of a "binding letter of interpretation" issued April 15, 1976, by the Division of State Planning, Department of Administration. That letter reconsidered, confirmed and expanded the Division's March 2, 1976 "binding letter" determining that GDC's segmental development of its remaining lands in Port Malabar  15,500 acres in some fifteen separate but neighboring tracts in and around the City of Palm Bay, Brevard County  will constitute a development of regional impact which is subject to regulation under Section 380.06, Florida Statutes (1975). GDC urges that the Division erred (1) in vacating its prior binding letters of interpretation determining that two of the smaller tracts, designated for development as Country Club Vista and PM-55, are not developments of regional impact; and (2) in determining that all the tracts known as Port Malabar are in the aggregate a development of regional impact, although those tracts are separated from each other by developed and undeveloped lands owned by others and by GDC lands which are "vested," hence beyond the Division's Section 380.06 jurisdiction, because GDC obtained development authority from local government before Section 380.06 became fully effective.[1]
The effect of the Division's April 15, 1976 letter of interpretation is to require GDC to submit applications for development approval of each tract to local governments, subject to review under certain standards by the regional planning agency and by the Governor and Cabinet sitting as the Land and Water Adjudicatory Commission. Sections 380.06(6) through (11), .07. A developer who bypasses Section 380.06 supervision of its development of regional impact does so at its peril and, notwithstanding local zoning and building permits, the developer may be enjoined during construction. Section 380.11. To sustain GDC's position with respect to one or more of the Port Malabar tracts would release that land from Section 380.06 control. We are not concerned here *1203 with a designated area of critical state concern, as we were in Cross Key Waterways v. Askew, 351 So.2d 1062 (Fla. 1st DCA 1977); but the Division's power respecting developments of regional impact derives from the same source, the Florida Environmental Land and Water Management Act of 1972.[2]
Section 380.06 required the Governor and Cabinet, acting as the Administration Commission, to adopt as rules, subject to legislative approval, guidelines and standards "to be used in determining whether particular developments shall be presumed to be of regional impact." The Administration Commission was directed to "consider and be guided by":[3]
(a) The extent to which the development would create or alleviate environmental problems such as air or water pollution or noise;
(b) The amount of pedestrian or vehicular traffic likely to be generated;
(c) The number of persons likely to be residents, employees, or otherwise present;
(d) The size of the site to be occupied;
(e) The likelihood that additional or subsidiary development will be generated; and
(f) The unique qualities of particular areas of the state.
Effective July 1, 1973, but subject to legislative approval, the Administration Commission adopted Chapter 22F-2, Fla. Admin. Code, providing that various developments of a certain character or density "shall be presumed to be a development of regional impact." Legislative approval was granted by HCR 1039, Fla.Laws (1973). Rule 22F-2.10, concerning residential developments, provides in relevant part that, in Brevard and other counties having a population between 100,001 and 250,000, a proposed residential development that is planned to accommodate more than 1,000 dwelling units shall be presumed to be a development of regional impact and subject to Section 380.06. The Rule further provides:
(2) As used in this section the term "residential development" shall include but not be limited to:
(a) the subdivision of any land attributable to common ownership into lots, parcels, units or interests, or
(b) land or dwelling units which are part of a common plan of rental, advertising, or sale, or
(c) the construction of residential structures, or
(d) the establishment of mobile home parks.
To alleviate a developer's "doubt whether his proposed development would be a development of regional impact," Section 380.06(4) provides that the Division of State Planning shall issue binding letters of interpretation resolving those doubts. Such letters "bind all state, regional, and local agencies, as well as the developer." Section 380.06(4)(a).

History of this controversy.
GDC designates as "Port Malabar" all its past and present holdings, in varying stages of development, in and around the City of Palm Bay. Portions of Port Malabar extend from Indian River 12.5 miles westward through the city and into the county. The southern boundary of the southernmost tract is roughly twelve miles from the north boundary of the northernmost tract. Of the total of 42,000 acres, 26,500 acres were "vested" by prior development authority given GDC by local governments. The 15,500 acres in Port Malabar which remain potentially subject to Section 380.06 lie in some fifteen tracts, ranging in size from less than a quarter-quarter section to one of *1204 roughly fourteen sections or 9,000 acres. The tracts are separated from each other by vested lands of GDC development or by lands owned by others. Some unvested Port Malabar tracts are within 500 feet of another and some are as distant as 7.5 miles.
The Division's determination that GDC's unvested 15,500 acres are in the aggregate a development of regional impact culminated agency proceedings which were concerned primarily with proposed development of three particular tracts: one of 59.4 acres, in which GDC proposed development of 885 dwelling units, called Country Club Vista; a nearby tract of 124.22 acres, for which GDC proposed 223 dwelling units, called PM-55; and Tract E, containing 1,600 acres for which GDC originally contemplated residential development above the 1,000 unit threshold at which the Rule presumes regional impact. The present controversy arose when GDC reduced its proposed development of Tract E to a subthreshold density of 202 dwelling units, intending thus to free Tract E for development independent of Section 380.06. The Division responded, in the March 2 and April 15, 1976 letters, by declaring all of unvested Port Malabar subject to Section 380.06 jurisdiction and vacating its prior determinations that development of Country Club Vista and PM-55 would not be of regional impact.
The first of the Division's binding letters of interpretation was issued March 28, 1974, in response to GDC's formal application for a determination that Country Club Vista was not a development of regional impact. The Division's letter announced a determination to the contrary affecting all of Port Malabar:
[T]he Division ... has determined that the proposed Country Club Vista development in Brevard County must be considered as part of the total Port Malabar development ... [and that] your proposed Port Malabar development is a Development of Regional Impact... .
The Division's March 28, 1974 binding letter did not explicate the decision, but an underlying staff memorandum expresses the view that "a single increment of a total development [cannot] be considered separately" and thus be exempted from Section 380.06 jurisdiction.
When it issued its binding letter of March 28, 1974, the Division had not ascertained which of GDC's Port Malabar lands were vested. On GDC's application, the Division made that determination May 9, 1974. Section 380.06(4)(a), Florida Statutes (1975). Finding that Country Club Vista was substantially vested and that the unvested portion was surrounded by vested GDC land and by property owned by others, the Division reevaluated the unvested portion and found in a binding letter issued May 30, 1974, that "the proposed Country Club Vista development ... is not a Development of Regional Impact... ."
Having exempted Country Club Vista from the effect of Section 380.06, GDC then sought the same treatment for PM-55, a proposed development of 223 dwellings on 124.22 acres. The Division issued a binding letter of interpretation on December 23, 1974, finding that PM-55 was not in itself a development of regional impact but that "this unit should be combined" for Section 380.06 treatment with nearby Tract A or Tract C, which GDC represented on its planning map as "probable" developments of regional impact. On January 6, 1975, a Division official (not the director) wrote GDC a letter determining that GDC's planning map of Port Malabar, showing all tracts, was made "the official point of reference for determining what tracts should be considered as Developments of Regional Impact," and stating:[4]

*1205 General Development Corporation will not be required to submit one ADA [application for development approval][5] designed to cover the entirety of [Port Malabar], but shall submit Applications for Development Approval for the tracts designated on said [map] as Developments of Regional Impact.
GDC's Port Malabar planning map showed the six larger tracts, lettered A through F, as "probable" developments of regional impact. The January 6, 1975 Division letter "hereby determined" that those tracts, for which particular development had not then been formally proposed, were "individual Developments of Regional Impact ..."
On August 7, 1975, on reconsideration of PM-55 at the request of GDC, the Division again determined that PM-55 should be combined with Tract A or Tract C "which are Developments of Regional Impact pursuant to the Division's letter dated January 6, 1975." Upon a further plea by GDC, the Division on December 3, 1975 revoked its August 7 determination "[b]ased on the additional information you have provided and the specific factual circumstances regarding your development," and stated:
Port Malabar Unit 55 is not, in and of itself, a development of regional impact, nor is it reasonably related to any other proposed development which, if aggregated, would constitute a development of regional impact.
With Country Club Vista and PM-55 now favorably determined to be free of Section 380.06 implications, GDC on December 15, 1975 filed a formal request for determination that Tract E was not, after all, a development of regional impact. The application represented that GDC "has radically changed its planning assumptions about tract `E' at Port Malabar since the original designation of this tract, and we would like to go forward with planning for the area which would call for 202 units of a minimum of 5 acres each." Sensing it was losing Section 380.06 control of Port Malabar by increments, the Division on March 2, 1976 issued a binding letter of interpretation determining that, its January 6, 1975 letter to the contrary notwithstanding, all nonvested portions of Port Malabar, including Tracts A through E, must be aggregated for consideration and would clearly exceed in aggregate the 1,000 dwelling unit threshold for presumed developments of regional impact. GDC's request for reconsideration produced another binding letter of interpretation on April 15, 1976, further reclaiming Division jurisdiction under Section 380.06:
We must therefore revoke the January 6, 1975 letter as a planning approach for Port Malabar... . Under your current planning strategies, we feel an overall ADA, even a conceptual one, is necessary. This letter is consistent with the March 2, 1976 determination that Tract E must go through DRI review but adds the requirement that an application for all non-vested areas be submitted including PM-55 and Country Club Vista. (Emphasis added.)
GDC timely sought judicial review here.

The Division's power to revoke binding letters of interpretation.
The Division's letters of May 30, 1974 and December 3, 1975 determined that development of Country Club Vista and PM-55, projecting 885 and 223 dwelling units respectively, would not be of regional impact. GDC urges that the Division was powerless to revoke those determinations by its letters of March 2 and April 15, 1976. The Division replies that GDC dissolved an agreement with the Division which was the essential inducement for the Division's determinations *1206 of May 30, 1974 and December 3, 1975.
Section 380.06(4) provides that the Division's binding letters of interpretation shall "bind all state, regional, and local agencies, as well as the developer." If binding letters of interpretation are to have the settling effect intended for them by the legislature, their integrity must be respected by the Division, developers and the courts. Yet this case teaches that the Division's commitments must be predicated on its understanding of a developer's plan for the land in question, which the developer may later wish to change, and may be predicated on an agreement between the Division and the developer concerning the Division's jurisdiction of the developer's other nearby lands not proposed for immediate development, which agreement the developer may later find burdensome.
When both the Division and the developer agree that changed plans or new information require revision of a prior binding letter of interpretation, Section 380.06(6) does not forbid the change. Considering the practicalities of dealings by developers with the Division, and the centrality of negotiation in the Division's satisfaction of public and private interests, we conceive also that the Division may state in its binding letters what understandings or agreements have induced them, and may later revoke a binding letter when its essential predicate is removed by the developer's change of plans or failure to perform as agreed.
Any concession of revocation power to the Division must be attended by safeguards against its abuse. The Division cannot be permitted to revoke its binding letters of interpretation, to the prejudice of developers, simply because the Division newly discovers information which if known earlier would have produced another result. Certainly the Division cannot revoke simply because it comes to believe its prior determination was ill-advised. If the Division wishes to predicate a binding letter of interpretation on its understanding of critical information submitted by the developer, or on a contemporaneous agreement with the developer affecting lands proposed for development or held in reserve, the substance of that information or agreement must be clearly stated in the binding letter of interpretation.
The Division's December 3, 1974 determination that development of PM-55 would not be of regional impact was influenced by an agreement between the Division and GDC, reflected in the letter and in antecedent correspondence referred to in the letter, that separate applications for development approval would be or "probably" would be submitted for Tracts A, B, C, D, E and F, as depicted on the Port Malabar planning map. The Division was content to release PM-55 from Section 380.06 scrutiny in exchange for conceded control of the larger tracts. We consider that the Division was released from the bargain when on December 15, 1975, GDC sought to release Tract E from the strictures of Section 380.06 by reducing its projected density to a subthreshold level of 202 dwelling units. GDC having dissolved the agreement by which PM-55 was exempted from Section 380.06 jurisdiction, the Division was at liberty on April 15, 1976, to revoke its exemption of PM-55.
The Division improperly revoked its May 30, 1974 determination that development of Country Club Vista would not be of regional impact. The May 30, 1974 letter referred vaguely to "information you have provided and the specific factual circumstances regarding your development," and the Division hedged its determination by references to subsequent review "if at any time in the future this development meets standards" for developments of regional impact; but the developer's fortunes cannot be dangled on so slender a thread. It may well be that the Division acted to exempt Country Club Vista with the understanding or expectation that GDC would concede Division jurisdiction of Tracts A through F, but the record does not establish such a concession by GDC as early as May 1974, and there is nothing in the May 30, 1974 *1207 binding letter which makes that concession a condition of the Division's exemption of Country Club Vista.
We cannot accede to the Division's view that its May 30, 1974 letter was not a binding letter of interpretation because it was not applied for on the prescribed form. While the Division then had forms, its rule prescribing their use was not effective until July 1976. Fla. Admin. Code R. 22F-1.16(2) (Supp.No. 69), eff. 7/7/76, superseded 10/13/76 (Supp.No. 72). More important, the Division cannot so undermine the effect of its own action, fairly interpreted. The letter of May 30, 1974, appears on its face to be an authoritative disposition of the matter at hand.[6] If the Division wishes to identify preliminary or tentative correspondence as nondeterminative, or if it wishes to reject requests for interpretation not submitted on proper forms, that is within the Division's power. See n. 4 supra.

The Division's decision that all nonvested GDC lands in Port Malabar constitute a development of regional impact.
Although the Division was irrevocably committed on May 30, 1974, to its exemption of Country Club Vista, it retained authority to decide whether development of part or all of GDC's remaining acreage in Port Malabar would be of regional impact. The binding letters of interpretation issued March 2 and April 15, 1976 found that the remaining nonvested GDC land constituted a development of regional impact and that Tract E was part of the development. GDC urges that Tract E must be independently examined for Section 380.06(4) purposes, and that the Division may not in that examination aggregate the projected unit density of contiguous GDC tracts separated from Tract E by vested lands and by lands of others. GDC urges that it has not prepared and cannot reasonably be required to prepare development plans for lands that will not be developed in the foreseeable future. The Division's position is that the impact of Tract E development cannot be measured without reference to GDC's other nonvested lands in Port Malabar and that, counting all probable units in the aggregated tracts, the overall GDC development will far exceed the Rule 22F-2 threshold of 1,000 units.
The issue presented is a mix of questions arising under Section 380.06, part of the Florida Environmental Land and Management Act of 1972, and Chapter 120, the Administrative Procedure Act of 1974. In issuing its March 2 and April 15, 1976, binding letters of interpretation, the Division was required to satisfy both the substantive requirements of Section 380.06 and the procedural requirements of the APA. If the Division erred procedurally, the question is whether material errors may have impaired the "fairness of the proceedings or the correctness of the action." Section 120.68(8).
Rule 22F-2 is the source of the parties' contentions for and against aggregating the projected unit density of separate but neighboring undeveloped tracts owned by GDC. That Rule, quoted earlier in this opinion, establishes a presumption, based on development density, that a certain proposed development in a county of a certain population will be of regional impact. The Rule presumes regional impact from development of airports; mining operations and electrical, oil storage, and port facilities of stated capacities; and recreation facilities, hospitals, industrial plant, office parks, schools, shopping centers and residential developments of a certain size, stated in terms appropriate to those types of development. Rule 22F-2 is the only substantive rule now extant which implements Section 380.06; and it was promulgated to satisfy the legislature's requirement for rule standards by which developments could be "presumed to be of regional impact" because of "environmental problems such as air or water pollution or noise," pedestrian or vehicular traffic, population density, site size, the likelihood of consequential development, and "the unique qualities of particular areas." Section 380.06(2).
*1208 Rule 22F-2, with its quantitative thresholds, meets the legislative requirement in letter and in spirit. But the Rule affords only a presumption, not a rule of decision. The Rule does not reduce the Division's responsibility under Section 380.06(4) to a mechanical chore of counting dwelling units or making other quantitative calculations. The presumption afforded by the Rule is to be respected, but the Division still must decide; and in decision the Rule must not be permitted to swallow the statute, which provides in Section 380.06(1):
"Development of regional impact," as used in this section, means any development which, because of its character, magnitude, or location, would have a substantial effect upon the health, safety, or welfare of citizens of more than one county.
Under the statutory definition, the character or location of a proposed development may conceivably make it of regional impact though its projected magnitude or density is less than the Rule 22F-2 threshold. That is not presumed  indeed, the presumption is to the contrary  but it may nevertheless be found as a fact. Similarly, the character or location of a proposed development may relieve it of regional impact although the projected density exceeds the threshold of the Rule's presumption. If numbers alone were conclusive, there would be little need for the substantive definition in Section 380.06(1), or for a mere "presumption," or for "binding letters of interpretation." In determining whether a newly proposed development will have regional impact because of its "character, magnitude, or location," the Division may and should consider existing area development, whether "vested" in Section 380.06(12) terms or not. A new residential development in the midst of a piney woods will have a different regional impact than the same development on the edge of an already overburdened multicounty water supply. The Division's task under Section 380.06(4) is not simply to count the houses and apply the presumption of Rule 22F-2, but rather to determine whether the statutory definition is satisfied.
For the same reasons, the Division also has power to consider a developer's known plans for related development of nearby lands. The Division is not bound to accept the developer's definition of the "development" for which the developer seeks a Section 380.06 exemption. It is the Division's responsibility to establish indicia of a relationship between ostensibly separate developments which is sufficient to require their aggregation for Section 380.06 consideration. Rule 22F-2.10(2)(b) considers dwellings a "development" for purposes of the presumption if they are "part of a common plan of rental, advertising, or sale." The Rule does not exhaust the Division's power to find other indicia of a single development involving separate tracts.
Standards for Division implementation of Section 380.06 are found not only in Rule 22F-2 but also in the definition section above quoted, in Section 380.06(2), text at n. 3, supra, and in Section 380.06(8), which requires regional planning agencies to review applications for authority to proceed with developments of regional impact.[7] The Division's responsibility is to implement *1209 those substantive standards through rules and orders adopted in compliance with the APA. Rulemaking for the guidance of developers and the public is desirable, inevitable, and within the power of the Administration Commission, Section 20.31(2), though subject in this area to legislative approval. Section 380.10(2). The Administration Commission has not as yet adopted substantive rules beyond those in Rule 22F-2 which establish quantitative presumptions.
In implementing Section 380.06, the Division and Administration Commission have a responsibility to "structure their discretion progressively by vague standards, then definite standards, then broad principles, then rules," McDonald v. Dep't of Banking and Fin., 346 So.2d 569, 580 (Fla. 1st DCA 1977), and to do so expeditiously but in good order. If an agency neglects its rulemaking power and attempts to promulgate policy of general applicability on an ad hoc basis by orders in particular cases, we must order rulemaking as a predicate for further action and, if necessary, invalidate agency action taken without rulemaking. E.g., Straughn v. O'Riordan, 338 So.2d 832 (Fla. 1976); McDonald, 346 So.2d at 585, State, Dep't of Admin. v. Stevens, 344 So.2d 290 (Fla. 1st DCA 1977); Price Wise Buying Group v. Nuzum, 343 So.2d 115 (Fla. 1st DCA 1977). When an agency's incipient policy is permissibly developed through orders, our duty is to require the agency "to expose and elucidate its reasons for discretionary action." McDonald, 346 So.2d at 584.
A binding letter of interpretation issued by the Division under Section 380.06(4) is final agency action in the form of an order which determines substantial interests of the developer. The Division's proceedings on a request for a binding letter of interpretation must therefore conform to Section 120.57.[8] Formal proceedings are available to the developer if timely requested pursuant to the model rules of the Department of Administration, Fla. Admin. Code R. 28-5.15, or Rule 22F-1.16(10) governing Division proceedings under Section 380.06(4).[9] GDC preferred the benefits of informal proceedings and did not request a Section 120.57(1) hearing; therefore GDC is not entitled to a trial-type hearing even on disputed factual issues unless we exercise a reviewing court's prerogative to order such a hearing. Section 120.68(6), Florida Statutes (1975); Mitchell v. School Board of Leon Co., 347 So.2d 805, 807 (Fla. 1st DCA 1977); United Faculty of Florida, etc. v. Branson, 350 So.2d 489, 494 (Fla. 1st DCA 1977).
Although the Division's proceedings leading to its binding letters of interpretation issued March 2 and April 15, 1976 need not have complied with the formalities of Section 120.57(1), they must have substantially complied with Section 120.57(2), which is applicable "[i]n cases to which subsection (1) does not apply." Informal proceedings require reasonable notice of the agency's action, whether proposed or already taken, "together with a summary of the factual, legal, and policy grounds therefor"; an opportunity "at a convenient time and place" for affected parties to present "written or oral evidence in opposition to the agency's action ... or a written statement challenging the grounds upon which the agency has chosen to justify its *1210 action"; and a timely written explanation of the agency's decision overruling objections.
Binding letters of interpretation, being orders, must conform also to the requirements of Section 120.59, which requires that orders resulting from formal or informal proceedings affecting substantial interests be in writing or stated in the record "and include findings of fact and conclusions of law separately stated." We held in McDonald, concerning orders after formal proceedings, that:
The agency's final order in 120.57 proceedings must describe its "policy within the agency's exercise of delegated discretion" sufficiently for judicial review. Section 120.68(7). [346 So.2d at 582]
The same requirement applies as well to orders entered after informal proceedings. Although an order in informal proceedings may explicate policy in a more "summary" way, Section 120.57(2)(a)1, the Division's emerging policy must be stated sufficiently to be recognized as a precedent in its own records[10] and to support meaningful judicial review:
The reviewing court shall deal separately with disputed issues of agency procedure, interpretations of law, determinations of fact, or policy within the agency's exercise of delegated discretion. [Section 120.68(7)]
The Division's binding letters of interpretation issued March 2 and April 15, 1975 do not satisfy statutory requirements for an order determining a party's substantial interests in informal proceedings. The matter before the Division for determination was whether development of GDC's Tract E would be of regional impact. The Division determined that Tract E is part of a development of regional impact embracing all nonvested acreage in Port Malabar. The basis for that determination is not sufficiently stated in the Division's orders.
It may be, as urged by GDC, that the Division has aggregated all of GDC's nonvested holdings in Brevard County, though they are separated from each other by vested lands of GDC and by land owned by others, simply because they are GDC's lands. The binding letters do not announce such a policy of aggregation. Neither do the letters explain or justify such an aggregation except in terms of the history of this particular controversy, in which the Division implies that GDC is estopped by its planning map to deny that its separate tracts are a single development. With respect to PM-55, we have relieved the Division of its part of the bargain by which the Division understood that GDC would submit separate applications for development approval for each of Tracts A through F; and we think it appropriate now to relieve GDC of its part of the same abortive agreement. Moreover, GDC never agreed to regard all of its unvested properties in Port Malabar as a single development of regional impact.
The Division's binding letters do not explicate facts, law or policy underlying the Division's decision that Tract E is part of a greater single development. It may be that the Division wishes to regard a single developer's contiguous properties as a single development, irrespective of separate or incomplete development plans. That position may be referable to Rule 22F-210(2), which for purposes of the presumption defines "residential development" as including:
(a) The subdivision of any land attributable to common ownership into lots, parcels, units or interests... .
If that is the Division's position, the Division has not said so, and it has not expressed by rule or otherwise any policy that would justify countywide aggregation, regional aggregation, or statewide aggregation of "land attributable to common ownership." It is not for us to define a "reasonable" policy and attribute it to an agency. The agency itself must announce and explicate its policy.
*1211 It may be that the Division predicates its determination concerning Tract E on findings that all of GDC's unvested Port Malabar lands are, in fact, destined to be a single development. GDC insists that the contrary is true. The Division's letters make no finding of fact to that effect and they express no law or policy which would guide the inquiry leading to such a finding. Rule 22F-2.10(2)(b) contemplates that dispersed dwelling units may nevertheless be part of a single development, if they are "part of a common plan of rental, advertising, or sale... ." But the Division's binding letters do not invoke that Rule or any other policy of aggregation.
The binding letter issued April 15, 1976 states:
[M]eetings with you and your staff on February 24 revealed that there [are] now at least tentative plans for three of the larger tracts.
That statement of a concession by GDC is insufficient, standing alone, to constitute or support a finding that, by standards not announced, approximately 15 separate tracts are in aggregation a residential development of regional impact.
If the Division's binding letters contained substantive material justifying the determinations made, those letters might well be sustained notwithstanding that the Division did not specify, as required by Section 120.57(2)(a)2, that GDC would have "an opportunity, at a convenient time and place," to present countervailing evidence or argument. In fact, GDC did request reconsideration of the Division's March 2 binding letter and did present written legal and factual arguments. However, the April 15 binding letter went further than simply explaining the Division's "decision overruling objections." Section 120.57(2)(b)4. The April 15 binding letter added a further adverse determination of GDC's substantial interests:
This letter is consistent with the March 2, 1976 determination that Tract E must go through DRI review but adds the requirement that an application for all non-vested areas be submitted including PM-55 and Country Club Vista.
The April 15 letter having constituted in this respect a new order, it was the Division's duty to give GDC "an opportunity at a convenient time and place" to present countervailing evidence and argument.
If on remand the Division is of the opinion that the stated deficiencies may be corrected on the present record, the Division may do so. If the Division is of the opinion that a binding letter of interpretation conforming to this opinion will require consideration and recitation of facts not appearing in this record, further informal proceedings may be had pursuant to Section 120.57(2). We do not in these circumstances require the Division to honor any GDC request for formal proceedings under Section 120.57(1), although the Division may do so in its discretion. The Division's binding letters of March 2 and April 15, 1976, constituting final agency orders determining GDC's substantial interests, are VACATED; the Division's binding letter of interpretation concerning Country Club Vista, entered May 30, 1974, is REINSTATED; and the cause is REMANDED to the Division for further proceedings.
MILLS, Acting C.J., and ERVIN, J., concur.
NOTES
[1] Sec. 380.06(12) provides that requirements respecting developments of regional impact shall not "limit or modify the rights of any person to complete any development that has been authorized" by lawful authority before the effective date of Administration Commission rules affecting developments of regional impact.
[2] This case does not raise constitutional questions concerning § 380.06. In Cross Key we held that certain provisions of § 308.05 violate Art. II § 3 of the Constitution by delegating legislative power without adequate standards for its exercise. In that decision we noted that § 380.06 contains greater legislative specification of standards for administrative action and that the legislature retained supervision over agency rulemaking. 351 So.2d at 1066, 1069.
[3] Sec. 380.06(2), Fla. Stat. (1975).
[4] For purposes of binding GDC to the implications of the planning map, which shows all tracts under a single legend "Port Malabar," the Division seems to regard the January 6, 1975, letter as a binding letter or as having other authoritative effect. For other purposes the Division argues that the letter was not a binding letter of interpretation because it was not signed by the Division's director. We need not decide that technical question; but it does point up the desirability of the Division distinguishing by clear designation its binding letters from other correspondence.
[5] An "ADA" is the application for development approval required before commencement of a development of regional impact. Sec. 380.06(6), Fla. Stat. (1975). It is filed with the local government having jurisdiction but is reviewed by the regional planning agency before approval is granted, § 380.06(8); and local government's approval is subject to review by the Governor and Cabinet. Sec. 380.07.
[6] The letter, signed by the director of the Division of State Planning, states "the proposed Country Club Vista development in Brevard County is not a Development of Regional Impact... . The proposed development, therefore, will not be required to comply with the provisions of Section 380.06, Florida Statutes."
[7] Sec. 380.06(8), Fla. Stat. (1975), provides in part:

In preparing its report and recommendations the regional planning agency shall consider whether, and the extent to which:
(a) The development will have a favorable or unfavorable impact on the environment and natural resources of the region;
(b) The development will have a favorable or unfavorable impact on the economy of the region;
(c) The development will efficiently use or unduly burden water, sewer, solid waste disposal, or other necessary public facilities;
(d) The development will efficiently use or unduly burden public transportation facilities;
(e) The development will favorably or adversely affect the ability of people to find adequate housing reasonably accessible to their places of employment; and
(f) The development complies or does not comply with such other criteria for determining regional impact as the regional planning agency shall deem appropriate.
[8] "Provisions of this section shall apply in all proceedings in which the substantial interests of a party are determined by an agency."
[9] The Administration Commission's first "rules of practice and procedure pertaining to developments of regional impact" were adopted July 7, 1976, after the Division had already acted finally on GDC's application for exemption of Tract E. Those rules provided that "the Division may hold a hearing on the petition at its discretion." Fla. Admin. Code R. 22F-1.16(6), eff. 7/7/76. We later held that agencies have no discretion to deny a hearing appropriately requested. State ex rel. Dep't of Gen. Serv. v. Willis, 344 So.2d 580, 592 (Fla. 1st DCA 1977). The Division's present rules, adopted by the Administration Commission three months after the initial rules, assure informal APA proceedings on applications for binding letters of interpretation, as well as formal proceedings when requested for determination of a disputed issue of material fact. Fla. Admin. Code R. 22F-1-16(6), (10), eff. 10/13/76.
[10] "All such rules and orders, catalogued by a subject-matter index, must be made available for inspection and copying by the public in an ever-expanding library of precedents to which the agency must adhere or explain its deviation. Section 120.53(2), 120.68(12)(b)." McDonald, 346 So.2d at 582.