894 So.2d 1006 (2005)
Thomas KERPER and All Salvaged Auto Parts, Inc., Appellants,
v.
DEPARTMENT OF ENVIRONMENTAL PROTECTION, Appellee.
No. 5D04-1182.
District Court of Appeal of Florida, Fifth District.
January 14, 2005.
*1007 Albert E. Ford, II, and Lea Brueggeman, of Ford & Brueggeman, P.A., Lake Mary, for Appellants.
David J. Tarbert and Jason Sherman, Department of Environmental Protection, Tallahassee, for Appellee.
PLEUS, J.
Thomas Kerper and his business, All Salvaged Auto Parts, Inc. (referred to collectively as "Kerper") appeal a final order of the Department of Environmental Protection ("DEP") finding them liable for failing to clean up used oil discharges. We have jurisdiction pursuant to Article V, section 4(b)(1) of the Florida Constitution. We reverse the final order for lack of competent, substantial evidence showing that Kerper was the person responsible for discharging the used oil. We also reverse because the DEP lacked authority to impose an unpromulgated rule on Kerper.

Facts
From 2000 to 2002, Kerper operated an auto parts salvage operation on a portion of land owned by Donald Joynt. Kerper originally intended to purchase the property but changed his mind after discovering environmental problems on the property. Kerper hired an attorney to extricate him from the agreement to purchase Joynt's property. On March 5, 2002, the attorney filed a citizen's complaint with the Orange County Environmental Protection Division against Joynt. Joynt filed an eviction proceeding against Kerper. The evidence conflicted regarding when Kerper vacated the property, but the ALJ found that "the evidence seemed clear that Kerper and ASAP did not go on Joynt's property on or after March 15, 2002."
On March 15, DEP inspected the property. Joynt told DEP inspectors that Kerper was responsible for a 55 gallon drum that was tipped over and leaking what appeared to be used oil. The inspection also revealed other unlabeled drums, containers of unknown fluids, a burn pile containing oil filters, battery casings and wiring, and areas of dark-stained soil in the area where Kerper had previously operated his business. Joynt accepted responsibility for contamination elsewhere on the property but maintained that Kerper was responsible for these items.
As a result of its inspection, DEP filed a notice of violation against Joynt and Kerper alleging eight counts of various environmental violations.[1] Joynt opted to settle but Kerper requested an administrative hearing. After a hearing, the administrative law judge ("ALJ") found that DEP proved Count I of the notice of violation (that Kerper failed to respond to used oil discharges), but dismissed the remaining *1008 seven counts as moot. DEP later entered a final order in accordance with the ALJ's recommended order.
On appeal, Kerper raises seven arguments.[2] Two warrant discussion.

Lack of Competent, Substantial Evidence
Kerper argues that the ALJ's finding that he discharged oil was not supported by competent, substantial evidence. We agree.
The only direct evidence presented by DEP that Kerper was the person responsible for spilling used oil was the objected-to hearsay testimony of now-deceased Donald Joynt. Joynt told DEP inspectors that Kerper was responsible for used oil leaking from an overturned 55 gallon drum on March 15, 2002. Kerper notes that section 120.57, Florida Statutes, allows hearsay to be admitted "for the purposes of supplementing or explaining other evidence, but it shall not be sufficient in itself to support a finding unless it would otherwise be admissible over objection in civil actions." (Emphasis added).
There was no other evidence proving that Kerper caused these used oil spills. Despite finding that Kerper was not operating his business or otherwise occupying the property on the date of the inspection, the ALJ apparently inferred that Kerper was at least partly responsible for the used oil spills because he had recently occupied the property. However, there was absolutely no evidence regarding the age of the spills. Neither the two DEP experts nor anyone else testified that the spillages occurred at a time when Kerper occupied the property. To the contrary, DEP experts testified that oil was "oozing" from a hole in the drum and was "leaking while [they] were there" on March 15. They righted the drum and discovered that it was still "partly full of its contents." If any inference can be derived from this testimony, it would support Kerper's argument that the drum was tipped over after Kerper vacated the property. Accordingly, DEP failed to present competent substantial evidence that Kerper was the person or entity responsible for the discharges.
We are also troubled by DEP's arguments regarding the sufficiency of evidence proving that the substance observed was used oil. Used oil is defined as "any oil that has been refined from crude oil, or any synthetic oil, that has been used and as a result of such use is contaminated by physical or chemical impurities." 40 C.F.R. § 279.1 (2003). Although DEP experts testified based on their training and experience that the substances they observed appeared to be used oil, they offered no basis for this opinion other than one expert testifying that the liquid "felt like used oil."
Kerper argues that DEP failed to conduct any analytical testing on the substance to establish that it was oil and was in fact used. In response to this argument, DEP contended at oral argument that it lacked the financial resources to test substances observed in every inspection and that their policy places the onus on the person cited to conduct analytical testing to prove that the substance in *1009 question is not used oil. Because we have already concluded that the evidence failed to establish who spilled the substances, we need not decide whether analytical testing is required to establish what the substance is. However, we believe DEP's stated policy is flawed. While DEP cannot be expected to conduct expensive analytical testing in every inspection, it is not unreasonable to expect them to conduct such testing in the relatively few cases in which a person cited demands proof through an administrative hearing. Unlike the testimony in this case, analytical testing would provide more conclusive proof of a substance and if the violations are established with such proof, DEP's costs for analytical testing could be ordered reimbursed by the violator. In addition, scientific testing to determine the nature of a contaminant would seem to be a prerequisite for effective remediation. DEP's current policy of requiring a person cited to conduct testing to prove his innocence improperly shifts the burden of proof required by law.

The Unpromulgated Rule
The final order states, "In the event the results of the initial site screening indicate that further assessment and/or remediation is required, the Respondents ... are also jointly and severally liable for completion of the required actions, consistent with the `Corrective Actions for Contaminated Site Case.'" Kerper argues that DEP's document entitled, "Corrective Actions for Contaminated Site Cases" ("CACSC") constitutes an unpromulgated rule. We agree.
Section 120.52(15), Florida Statutes (2003) defines an agency rule, in part, as an "agency statement of general applicability that implements, interprets, or prescribes law or policy or describes the procedure or practice requirements of an agency and includes any form which imposes any requirement or solicits any information not specifically required by statute or by an existing rule." This Court has stated that, "[a]n agency statement that either requires compliance, creates certain rights while adversely affecting others, or otherwise has the direct and consistent effect of law is a rule." Department of Revenue of State of Fla. v. Vanjaria Enterprises, Inc., 675 So.2d 252, 255 (Fla. 5th DCA 1996).
Under either construction, the CACSC is a rule. It is a "statement of general applicability" insofar as it applies to all contamination site cases. It "prescribes policy" and "describes the procedure or practice requirements of an agency." For example, it sets the procedure for a violator to (1) initiate site sampling and analysis; (2) propose interim remedial actions; (3) file contamination assessment and risk assessment plans; (4) submit written progress reports; and many other procedures. The CACSC "requires compliance" with these policies, using mandatory terms, such as "shall." Accordingly, the CACSC should be adopted through formal rulemaking procedures.
At oral argument, DEP suggested for the first time that its authority to use the CACSC stems from section 376.30701, Florida Statutes (2003). In fact, just the opposite is true. Section 376.30701 specifically states, in pertinent part, "By July 1, 2004, the secretary of the department shall establish criteria by rule for the purpose of determining, on a site-specific basis, the rehabilitation program tasks that comprise a site rehabilitation program." (Emphasis added).
Section 376.30701 was enacted in 2003 by Chapter, 2003-173, Laws of Florida. The staff analysis for that bill is instructive. It states, in pertinent part:
In the past five years, the Florida Legislature adopted Risk-Based Corrective Action principles to apply to cleanups *1010 conducted at petroleum-contaminated sites, brownfield sites in designated brownfield areas, and drycleaning-solvent-contaminated sites (often referred to as "program" sites). [See ss. 376.3071(5), 376.81, and 376.3078(4), F.S., respectively.] Currently, sites that fall outside the three program areas in which RBCA has been adopted are subject to one of two cleanup processes. The most common of these is often referred to as the CAP/RAP (Contamination Assessment Plan/Remedial Action Plan) process, wherein site cleanups are generally completed by licensed environmental professionals in accordance with the DEP's Model Corrective Actions for Contaminated Sites guidance document. This document provides recommended procedures for the development and approval of work plans and reports. The DEP's cleanup criteria are based on applicable ground water and surface water standards, ground water guidance concentrations, contaminant leachability factors and soil exposure guidelines. The CAP/RAP process has always incorporated general notions of risk-based cleanup but without the clear direction and authority provided by the statute for the three true RBCA programs.

....
HB 1123 creates s. 376.30701, F.S., establishing risk based corrective principles to all contaminated sites throughout the State. The applies to a variety of site rehabilitation scenarios including voluntary site cleanup or state-managed cleanup by the DEP. The bill directs the Secretary of the DEP to adopt rules no later than July 1, 2004, to develop site rehabilitation program tasks that include applying RBCA principles.

Fla. H.R. Comm. on Natural Resources, HB 1123 (2003) Staff Analysis 1 (March 11, 2003) (at www.flsenate.gov/data/session/2003/House/bills/analysis/pdf/h1123.nr.pdf) (italics added).
This staff analysis makes clear that statutes and administrative rules were in place regarding clean-up of petroleum-contaminated sites, brownfield sites and drycleaning-solvent-contaminated sites, but no rules existed as of 2003 for contaminated sites other than in these three areas.
Even before 2003, it should have been clear to DEP that they needed to adopt this policy through rulemaking. Chapter 376 has long imposed a duty on DEP to "[e]stablish rules, including but not limited to ... removal or disposal standards ..." § 376.303(1)(a), Fla. Stat. (1987-2003). More generally of course, section 120.54(1)(a), Florida Statutes (2003) clearly states, "Rulemaking is not a matter of agency discretion. Each agency statement defined as a rule by s. 120.52 shall be adopted by the rulemaking procedure provided by this section as soon as feasible and practicable."
At oral argument, DEP conceded that it has failed to promulgate agency rules regarding contaminated site rehabilitation as required by section 376.30701. "If an agency neglects its rulemaking power and attempts to promulgate policy of general applicability on an ad hoc basis by orders in particular cases, we must order rulemaking as a predicate for further action and, if necessary, invalidate agency action taken without rulemaking." General Development Corp. v. Division of State Planning, Dept. of Administration, 353 So.2d 1199, 1209 (Fla. 1st DCA 1977). Because DEP has failed as of yet to promulgated such rules, it is without authority to impose the CACSC on Kerper, either directly or through the adjudicatory process. Accordingly, we reverse the final order on this basis as well.
*1011 Because we are reversing the final order finding Kerper liable on Count I of the notice of violation and Kerper prevailed on the remaining counts below, we also reverse the denial of his motion for attorney's fees and remand for imposition of trial and appellate fees and costs.
REVERSED; REMANDED.
SHARP, W., J., concurs.
GRIFFIN, J., concurs in part, dissents in part, with opinion.
GRIFFIN, J., concurring in part; dissenting in part.
I concur with the result of the majority opinion except I dissent from the imposition of attorney's fees.
NOTES
[1] The notice of violation alleged the following counts: Count I, failure to respond to used oil releases; Count II, failure to perform a waste determination on an estimated three 55-gallon drums and three 5-gallon containers with unknown contents, on used oil filters, and on burned and buried lead acid batteries; Count III, failure to clearly mark or label containers of used oil; Count IV, failure to document disposal of hazardous waste including gasoline, waste antifreeze, and waste batteries; Count V, failure to document proper disposal of used oil and waste gasoline; Count VI, failure to document reclamation of Freon; Count VII, allowing contaminated stormwater to drain into low areas onsite and offsite without proper pollution controls and stormwater permits; and Count VIII, responsibility for DEP investigative costs "of not less than $500.00":
[2] He raises seven arguments: (1) the ALJ's finding that Kerper caused the discharge of oil is not supported by competent, substantial evidence; (2) the ALJ improperly shifted the burden of proof to Kerper to prove that he did not discharge the used oil; (3) the ALJ abused his discretion by admitting evidence of prior bad acts; (4) the ALJ abused his discretion by excluding one of Kerper's witnesses; (5) the DEP's "Corrective Actions for Contaminated Site Case" is an unpromulgated rule; (6) section 376.305, Florida Statutes is facially unconstitutional because it unlawfully delegates legislative authority to DEP; and (7) the ALJ and the DEP erred in refusing to award Kerper attorney's fees and costs.