# DIVERSICARE CORPORATION v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, et al.

Case No. 84-0244

State of Florida, Division of Administrative Hearings

January 28, 1985

### APPEARANCES OF COUNSEL

**Alfred W. Clark, Laramore & Clark, P.A.,** for petitioner.

**Thomas W. Stahl** for respondent, (DHRS).

**John D. Buchanan** and **Patrick E. Hurley, Henry, Buchanan, Mick & English, P.A.,** for respondent, (HHHC, XXVI).

## OPINION

RECOMMENDED ORDER

P. MICHAEL RUFF, Hearing Officer.

Pursuant to notice, this cause came on for hearing before P. Michael

Ruff, duly designated Hearing Officer, on July 12, 1984, in Sarasota, Florida.

This case arose upon a petition filed by Diversicare for formal proceedings pursuant to Section 120.57(1), Florida Statutes, to resolve a dispute arising upon Petitioner's objection to the Department's "free form" issuance to Heritage Hall Health Care, XXVI (Heritage Hall), of a certificate of need to construct and operate a new 60-bed nursing home in DeSoto County, Florida.

On July 5, 1984, the Hearing Officer denied a Motion to Consolidate filed by Diversicare, wherein it sought to consolidate this proceeding with DOAH Case No. 84-2210, wherein Diversicare contests the free form denial of its own certificate of need application to construct a 35-bed addition to its own nursing home in DeSoto County, known as DeSoto Manor Nursing Home. That application was filed later than the application involved in the case at bar, such that it was considered in the HRS review process in a later "batching" cycle, specifically the batching cycle occurring immediately after the batch in which the instant application of Heritage Hall was reviewed by HRS, pursuant to the reviewing procedure set up by Rule 10-5.08, Florida Administrative Code. Because of the legally mandated batching review process, the undersigned denied consolidation of that proceeding with this one, for purposes of comparative and competitive review, since, at law, those applications are not deemed competitive. Thus, DeSoto Manor, the Petitioner, participates in this proceeding in the capacity of an existing licensed nursing home, owner and operator, in opposition to the application and proposed addition of a new nursing home in its district and sub-district, filed by Heritage Hall.

Heritage Hall presented the testimony of William Brando West and Mr. Thomas J. Conrad at the hearing. Additionally, Heritage Hall was permitted to present the deposition testimony of Mr. Thomas F. Porter, Health Care Planner, with HRS, in support of its application subsequent to the final hearing. HRS presented the testimony of Mr. Herbert E. Straughn, and its Exhibits 1 through 6, which were admitted into evidence. Diversicare presented the testimony of Ms. Johnny D. Gonzalez, Mr. Robert J. Webber, and Mr. Kenneth W. Kearn, II. Petitioner's Exhibit A was received into evidence at the hearing. Additionally, Petitioners requested that official recognition be taken of Petitioner's Exhibit B submitted post-hearing, consisting of an agency action report in regard to a CON application in neighborhing Hardee County, which Petitioner maintains exhibits inconsistent agency action by HRS with regard to a certificate of need application involving similar facts and circumstances.

111

This motion is denied. It has not been demonstrated by Petitioner that the matter for which it seeks official recognition involves facts not subject to dispute because they are generally known within the territorial jurisdiction of this Hearing Officer, nor that there are facts not subject to dispute because they are capable of accurate and ready determination by resort to sources of unquestioned accuracy for purposes of Section 90.202(11)(12), Florida Statutes, nor does the agency report constitute an official action, that is final agency action, of HRS as an agency of the Executive Department of the State, for purposes of Section 90.202(5), Florida Statutes. Further, because the request came post-hearing after all parties had ample opportunity to present all available, relevant, admissible evidence in support of their positions, the request is not deemed timely for purposes of Section 90.203(1), Florida Statutes, inasmuch as it would require reopening the record of this proceeding at this late date to accord the adverse party, Heritage Hall, an opportunity to put on evidence to meet and oppose the request for official recognition, with which it does not agree. See also Section 120.161, Florida Statutes.

The issue to be resolved in this proceeding concerns whether Heritage Hall is entitled to this Certificate of Need request for a 60-bed, new, free-standing nursing home in DeSoto County. Involved in that general issue is a question, in view of the undisputed fact that the applicable need methodology justifies the addition of at most 15 nursing home beds in the DeSoto County sub-district; whether any other legally relevant Certificate of Need review criteria, including the question of accessibility of nursing home beds to the pertinent population of DeSoto County, would constitute a sufficiently pivotal circumstance, which, if proven, would justify grant of the application.

## FINDINGS OF FACT

Heritage Hall is a partnership, domiciled in the State of Virginia, which owns and operates ten nursing homes in that state. Heritage Hall did not, at the time of the close of this record, own or operate, nor have under completed construction, any nursing home in Florida. Heritage Hall filed a "letter of intent" to construct, own and operate a 60-bed nursing home in the counties of Collier, DeSoto, Highlands and Lee. On July 15, 1983, Heritage Hall filed the specific Certificate of Need application at issue with HRS, requesting authorization to construct a 60-bed free-standing nursing home in DeSoto County. That application was deemed complete on September 15, 1983, and a free form decision was made to grant it by HRS on December 1, 1983. The proposed nursing home would be located in the vicinity of Arcadia, in DeSoto County, a sub-district of HRS District VIII.

112

Diversicare Corporation, Inc. d/b/a DeSoto Manor Nursing Home (DeSoto Manor), (Diversicare), owns and operates DeSoto Manor Nursing Home, an existing 60-bed nursing home facility located in Arcadia, DeSoto County, Florida. On November 3, 1983, Diversicare filed a Letter of Intent with HRS announcing its intention to seek a Certificate of Need for an addition to its DeSoto County facility. It ultimately filed an application seeking authorization for a 36-bed nursing home addition on January 12, 1984. No additional information was requested by HRS and the application became complete by operation of law on March 15, 1984. That application is thus in a separate and later batch for purposes of Rule 10-5.08, Florida Administrative Code, and thus was not comparatively reviewed with the application in the case at bar as a competing application. On May 1, 1984, HRS notified Diversicare of its intent to deny its application for the 36-bed addition.

Heritage Hall proposed to construct a 60-bed nursing home at a total cost of $1,597.293. This specific cost of construction, not including land acquisition cost, is proposed to be $1,070.740. The nursing home's cost of construction allocated on a per bed basis would be $26,622. Heritage Hall proposed to finance this project to a tax-exempt bond issue in an aggregate amount of $1,436,075, carrying a 10 per cent interest rate with a 30-year maturity. Additionally, the Heritage Hall partnership would invest $161,218. Heritage Hall projects that once it begins operation of the proposed new nursing home, that a 97 per cent occupancy level for the proposed 60 beds would be reached within six months. Included within that projection, Heritage Hall projects that 49 per cent of the patient revenues would come from Medicaid reimbursement, that 10 per cent would come from Medicare reimbursement, and that 40 per cent of its revenues would be attributable to private paying patients, not included within any relevant government entitlement programs. The remaining one per cent of its patient revenue base would be charged off and attributable to bad debt, or indigent patients. Heritage Hall proposes charges for its Medicare and Medicaid patients to constitute $62.39 per day, and its charges for private paying patients would be $68.00 a day for a private room, and $65.00 per day for a semiprivate room. It proposes to staff its facility with five registered nurses, six licensed practical nurses (LPN), 17 nurses aides, and an administrative and miscellaneous employee staff of 16, for a total staff for a 60-bed nursing home of 44 employees. DeSoto Manor's present patient population is largely composed of Medicaid and Medicare patients, such that 84 per cent of its revenue is derived from Medicaid and Medicare sources. Its private paying patients are a

small minority contributing 16 per cent of its total patient revenues. DeSoto Manor has consistently experienced 99 - 100 per cent occupancy for all of 1983 and 1984, upon which is earned a net income for fiscal year 1983 of approximately $15,000. DeSoto Manor presently employs on its staff 2.2 registered nurses, 5.6 LPN's, 17.1 aides, and 17.4 administrative ad miscellaneous employees, those figures being expressed in terms of full-time equivalent employees in those categories. Desoto Manor's application filed in a later batch is not at issue in this proceeding, in terms of comparative review for the purpose of determining whether Heritage Hall or DeSoto Manor is entitled to a Certificate of Need for DeSoto County nursing home beds as a result of this proceeding. Such a proposal, however, to add additional beds to an existing nursing home, is worthy of consideration as an alternative means of providing .nursing home services to the public in District VIII, and specifically the sub-district of DeSoto County, pursuant to authority cited *infra*. In that vein, DeSoto Manor proposes to add 36 additional beds at a total cost of $767,337, including involving a construction cost of $541,280, which is equivalent to a $21,260 cost per bed for the proposed 36-bed addition. DeSoto Manor would require the equivalent of 17.3 full time additional staff members, if such an addition (a 36-bed addition) were approved and built. DeSoto Manor Charges will be (on January 1, 1985) $45.56 a day for Medicaid and Medicare patients, and $47.00 a day for its private pay patients. If its 36-bed addition were installed, it would charge $49.31 per day for Medicaid and Medicare patients, and $53.00 a day for private paying patients.

DeSoto is a relatively small county geographically, located inland from the counties bordering the Gulf of Mexico in District VIII. It is a rural county in character, as that term relates to its economic base being largely agriculture, and its low population density, with its population center being in the only sizable community of Arcadia, the county seat, located approximately in the geographic center of the county. It is surrounded by Sarasota, Charlotte, Highlands, and Hardee Counties. Highlands and Hardee Counties are in District VI, with Sarasota, Charlotte and DeSoto Counties being in District VIII, as are Lee, Collier, Glades and Hendry Counties. In 1987, DeSoto County is expected to have a population of 3,749 persons age 65 and over. The county is not experiencing a significant rate of growth at this time, nor is it expected to through 1987, the pertinent "horizon" year.

Pursuant to Rule 10-5.11(21), Florida Administrative Code, the nursing home bed need methodology, HRS computes a need for additional nursing home beds in its health care districts and sub-

114

districts, first by determining "actual need" or the "area specific bed need allocation". The actual need for additional nursing home beds is computed by means of a population based formula embodied in that rule. The second step of the need/availability determination process involves determining how many beds above or below the actual need determined may be added before the utilization in the district or sub-district falls below 80 or 85 per cent. The actual need or "area specific allocation" is determined by multiplying the poverty ratio for the district or sub-district by the statewide nursing home bed need ratio of 27 per 1,000 persons age 65 and older, and the population of the district or sub-district age 65 and older, and then subtracting from this computation the number of existing nursing home beds within the district or sub-district. Within District VIII, the poverty ratio equals 8.61 divided by 12.70, the relevant population of the district for the applicable year being 213,561, with the population for DeSoto County, as a sub-district, being 3,749 persons age 65 and older. There were 3,671 licensed nursing home beds in District VIII at the time of the hearing, and there were 1,130 beds approved, but not yet licensed or open in the district. There were 60 licensed and operating nursing home beds in DeSoto County. There were 3,904 actually "needed" or allocated beds in District VIII, which, when added to those beds approved but not yet licensed and operating, total an aggregate of 4,801 licensed and approved beds in the district. Thus, there are 997 excess nursing home beds over and above those actually needed in District VIII by 1987, according to the population based formula used in the first part of the need/availability determination process embodied in the above-cited rule. There is an actual need in DeSoto County alone of nine additional nursing home beds by 1987, based upon the sub-district actual need allocation determined by the first part of the above methodology process of 69 beds.

The second part of the need/availability determination process computes how many additional beds can be added to a district or sub-district before the occupancy rates of nursing home beds in the district or sub-district fall below the applicable rule mandated percentage. In DeSoto County, the applicable percentage is 80 per cent, because the sub-district of DeSoto County indicates some need for additional beds, although the district as a whole has excess beds with no additional actual bed need shown. Thus, based upon the entire applicable computation, 15 beds may be added to DeSoto County before utilization of nursing home beds in the county will drop below the threshold of 80 per cent. It has thus been established that if 60 beds are added to the bed supply in DeSoto County, for instance by a grant of the instant

application, the utilization of nursing home beds will decline to approximately 50 per cent.

Under the above rule methodology, HRS, in adhering to the requirements of that rule, would not normally grant a certificate of need when only a small number of additional nursing home beds are computed to be available under that formula, that is, for a new free-standing nursing home facility. It is undisputed that construction of a new nursing home of less than 60 beds is not considered to be financially feasible. That rule of thumb does not apply, however, to the addition of beds to an existing, already-built parent facility, and it is undisputed that the addition of needed beds to an existing facility is more cost-effective in terms of construction costs and staffing, than the construction of a new facility. In its review process, with regard to the instant application and proceeding, HRS did not consider the alternative of adding new needed beds to the existing facility operated by Diversicare (DeSoto Manor), since the Diversicare application was not filed in the same batching cycle as the applicaton at bar filed by Heritage Hall.

Although the nursing home bed need determination formula reveals a maximum need of 15 beds for DeSoto County by 1987, HRS proposed to approve 60 beds in conjunction with the Heritage Hall application. In its review process, HRS took into account the fact that DeSoto and surrounding counties in District VIII were experiencing high occupancy rates as to existing licensed beds, and took the position then and in this proceeding that residents of DeSoto County needing nursing home care would have difficulty finding available nursing home beds. HRS failed to take into consideration, in its review process, the additional number of nursing home beds which had been approved in surrounding counties (as pertinent hereto, the surrounding counties of District VIII), but which are not yet licensed and actually operating. Thus, at the time of hearing there were 302 approved but not yet opened beds in Charlotte County, 97 approved but not yet operating beds in Collier County, 222 approved but not yet opened beds in Lee County and 597 approved but not yet operating beds in Sarasota County. Thus, the approved but not yet licensed and operating beds will result in an increase of 1,217 beds available, when open, to the residents of DeSoto and the adjacent counties of District VIII.[1]

---

[1] HRS apparently considered occupancy rates in surrounding counties in District VI consisting of Highlands and Hardee Counties which had respectively, occupancy rates of approximately 99 per cent. Highlands County has 137 beds approved but not yet operating and Hardee County has had 19 additional beds approved, neither of which figure in the computation of that 99 per cent occupancy rate, thus, Highlands will, with the additional approved but not yet opened beds experience an 81.2 per cent

116

The applicant and HRS seek to justify the approval of 60 additional beds in DeSoto County by reference to the high utilization rates being experienced in adjacent counties. As pertinent hereto, Charlotte County was experiencing an occupancy rate of 99 per cent, Sarasota was at 88 per cent occupancy, Lee County at 91.5 per cent, with Collier County at 64.5 per cent. Those figures do not take into account the latest nursing home District VIII occupancy figures as of June 29, 1984 which reflect the above-discussed additional approved, but not yet opened beds, and which result in the occupancy rates in these counties falling substantially. Thus, Charlotte is now experiencing only an 80.4 per cent occupancy, with lowered occupancy rates resulting in Lee and Collier County as well with the addition of the approved, but not yet opened beds. These lowered occupancy rates resulting from the opening of these approved, but not yet licensed beds, were not considered by HRS at the time of its initial review, and free form grant of the certificate of need at issue. The opening of these hundreds of additional beds will continue to reduce occupancy in those counties and provide available beds to residents of District VIII and to residents of DeSoto County, to the extent those beds in the other counties are deemed accessible. HRS admitted at hearing that the availability of beds has increased in the district since its first review of the application. The financial feasibility of the Heritage Hall proposal depends upon an assumed 97 per cent occupancy in its sixth month of operation, and projects that 40 per cent of the revenues will be derived from private, paying patients. The 97 per cent occupancy is an optimistic projection however, because only nine beds are shown to be actually needed in the county by 1987, and only 15 beds can be added before occupancy will drop below 80 per cent. The addition of 60 beds would drop occupancy at DeSoto Manor and the proposed Heritage Hall facility, if built, to 50 per cent. The Heritage Hall projection for revenues from private, paying patients which is 40 per cent, is substantially more than the current revenue source from private, paying patients experienced by DeSoto Manor of 16 per cent. In order to achieve such an occupancy rate in such a short time, and such a higher percentage of private, paying patient revenues, Heritage Hall must aggressively market its new facility and nursing home service so as to attract private, paying patients. Based upon historical evidence of record, it is likely that the

occupancy rate and Hardee County will experience a decreased occupancy rate caused by the addition of its 19 approved but not yet opened beds. The legal basis for HRS' consideration of occupancy rates in these adjoining counties, not lying in District VIII, in its determination of need for purposes of the instant application, it not clear, however; presumably they were considered solely as to the question of "accessibility."

patient base in DeSoto County itself will not support such a high percentage of private, paying patients and such patients will doubtless have to come from other areas or counties in the district, specifically the counties lying along the coast of District VIII. There is no evidence to establish that nursing home patients in the coastal counties have any inclination to seek nursing home care in DeSoto County, particularly because those coastal counties are already experiencing lowered occupancy rates, and nursing homes there need more patients. There is thus no demonstration that residents of the coastal counties in District VIII (or other adjacent counties for that matter) would travel to DeSoto County for nursing home care when there are empty beds available to them closer to their homes or the homes of their families in those counties.

Heritage Hall proposed to recruit its staff from DeSoto County and the surrounding geographical area. DeSoto Manor however, itself is currently experiencing severe problems in recruiting registered nurses for its facility, in spite of repeated advertising and recruitment attempts. Potential staff members share a reluctance in becoming employed at DeSoto Manor, which lies in an isolated, rural area, and which must compete with the many nursing homes lying in the coastal areas in the other counties of District VIII for staff, and which areas offer more living amenities in general, than does the isolated, rural, small community setting in which DeSoto Manor is located. Indeed, other District VIII nursing home administrators have contacted the administrator of DeSoto Manor, in her capacity as administrator, as well as in her capacity as president of the Florida Health Care Association for District VIII, seeking assistance in obtaining additional staff for their facilities. Approval of the Heritage Hall application will, in effect, double the competition for staff members for nursing homes in DeSoto County, and will concomitantly, increase DeSoto Manor's present difficulties in obtaining and retaining appropriate employees.

In calculating the financial impact which an additional 60-bed nursing home would have on the existing DeSoto Manor facility, DeSoto Manor assumed that the number of nursing home beds said to be available before occupancy dropped below 80 per cent, which includes the proposed 15 additional beds, would be full of patients and that these patients would be evenly split between the two nursing homes in the county. Thus, each nursing home would have approximately 37.5 patients in its respective 60-bed facility. In this event, and taking into account the concomitant reduction in staff, salaries and other per patient expenses because of a reduction in the number of patients, the proposed Heritage Hall facility would likely experience a

118

net loss of approximately $232,587 for the first year of operation of its additional facility. DeSoto Manor's Medicaid reimbursement revenues would fall $31,722 below DeSoto Manor's actual cost of providing Medicaid patient care. Thus, in order to recover lost revenues and achieve a break-even profit and loss status, a significant increase in patient charges over existing charges would be necessary. The weight of such increase in patient charges would have to fall upon the private, paying patients in the revenue mix of each nursing home, because of the inflexible nature of the current Medicaid reimbursement scheme.

In evaluating the DeSoto County population's accessibility to nursing home services, HRS admittedly did not take into account the provisions of Rule 10-17.020(2)(b), Florida Administrative Code, which is the local health plan as it relates to nursing home planning adopted in the most current HRS rules. This local health plan provides for nursing home services to be available within a one hour travel time by automobile for at least 95 per cent of the residents of District VIII. The president of the District VIII chapter of the Florida Health Care Association, who is the administrator of DeSoto Manor, is aware of at least ten nursing homes within a one hour drive of Arcadia and at least three others within that radius which are under construction, a significant number of which are in District VIII. Arcadia is located in the center of DeSoto County. All counties surrounding Desoto County in District VIII have substantial numbers of aproved beds which have not yet been opened and at least Sarasota and Charlotte Counties, which are adjacent to DeSoto County have occupancy rates in the neighborhood of 80 per cent or less. The applicant did not establish, in furtherance of its attempted justification of 60 additional beds for DeSoto County, the lack of accessibility to DeSoto County nursing home patients of beds in the adjoining counties of District VIII, especially Charlotte and Sarasota, inasmuch as it was not established that those nursing homes in those coastal counties are more than an hour's driving time from the center of DeSoto County. Although, as witness Straughn for HRS established, Sarasota or the more westerly parts of Sarasota County, are approximately 49 miles and roughly an hour driving time from DeSoto County, it was not established that there are not nursing homes available in closer parts of Sarasota County which are accessible in less than an hour's driving time to DeSoto County residents and/or patients. Indeed, witness Porter testifying after the hearing by deposition, established that most of the nursing homes in the coastal counties involved in this proceedings, are within "40 some miles" from the present DeSoto Manor facility and the proposed Heritage Hall facility. Indeed, witness Porter established

that Port Charlotte, in the immediate vicinity of which are several nursing homes, and which county is experiencing now an 80.4 per cent occupancy rate (with the above-mentioned numbers of approved but not yet installed beds) is only 25 miles from the proposed Arcadia location. Thus, the criteria of the above rule which HRS witnesses failed to take into account, encompasses nursing home beds available or approved in the coastal counties referred to, which are accessible to patients in DeSoto County.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction of the subject matter and the parties to this proceeding. Section 120.57(1), Florida Statutes.

The general criteria for certificate of need review are set forth in Section 381.494(6)(c) and (d), Florida Statutes, as well as Rule 10-5.11(1)—(12), Florida Administrative Code. The total number of nursing home beds which may be approved to be installed in a given health care planning district or sub-district by approvals of certificates of need therfor, is governed by the provisions of Rule 10-5.11(21), Florida Administrative Code. In accordance with Section 381.494(6)(c)1, Florida Statutes, the local district health plan criteria must be considered when certificate of need applications for nursing homes are reviewed. Specifically, in Desoto County and District VIII, the local health service district, health care planning criteria are adopted in Rule 10-17.020, Florida Administrative Code.

Rule 10-5.11(21)(a), Florida Administrative Code, provides:

The department will not normally approve applications for new or additional community nursing home beds in any departmental service district if approval of an application would cause the number of community nursing home beds in that departmental service district to exceed the number of community nursing home beds calculated by the methodology described in subsection (21)(b), (c), (d), (e), (f), (g), and (h) of this rule.

There is no question that if a 60-bed additional nursing home for DeSoto County were approved that that number of approved nursing home beds would exceed by 45 beds the maximum number of nursing home beds permissible as calculated by the methodology mandated in the above-cited rule. It was established that the addition of 60 nursing home beds to DeSoto County will cause the occupancy rate in the total number of nursing home beds in that county at that point (120), to decrease to 50 per cent. That rate is substantially below the 80 per cent

120

minimum occupancy rate required by Rule 10-5.11(21)(g)(h), Florida Administrative Code. Thus, the Heritage Hall Nursing Home application is clearly not consistent with this rule and some additional extenuating circumstance or circumstances must be looked to in considering whether to grant such an application under the small bed need allocation scenario with which we are confronted.

The decision by HRS to initially approve an additional 60 nursing home beds for DeSoto County in its "free form" review process was in spite of the requirements of Rule 10-5.11(21), and resulted from HRS' evaluation of circumstances as they existed at the time of review. The factual circumstances relating to the need for additional nursing home beds in DeSoto County have changed since that review period. A Section 120.57(1) proceeding is a de novo proceeding and the most recent factual circumstances must be evaluated through the presentation of evidence thereof, presented to the Hearing Officer, before a determination is made whether the subject application for an additional 60 nursing home beds should be approved. *McDonald v. Department of Banking and Finance*, 346 So.2d 569 (Fla. 1st DCA 1977).

When HRS originally reviewed the Heritage Hall application, the nursing homes in the counties surrounding DeSoto County were experiencing high utilization rates, often as much as 99 per cent. Because of the high utilization in the surrounding counties, particularly those in District VIII, and the high utilization experienced by the nursing home within DeSoto County (99 percent), HRS concluded that the residents of DeSoto County needed additional nursing home services. The rule methodology contained in Rule 10-5.11(21) reveals an actual allocation need of nine additional beds for DeSoto County. HRS proposed to approve Heritage Hall's application for 60 beds due to the lack of financial feasibility in building a new nursing home of a smaller size than 60 beds. The circumstances extant when HRS initially reviewed the application in its free form review process have now changed. Utilization in the surrounding counties in District VIII, particularly Charlotte and Sarasota have dropped by as much as 20 per cent. This reduction in utilization in nursing home beds means that more beds are available to residents of District VIII and the DeSoto County sub-district. Thus, HRS' position that nursing home services were not adequately available because of high utilization rates in the other counties in the district is no longer supportable by the evidence and the facts have been proven to be otherwise. Utilization will continue to decrease in the surrounding counties of District VIII because of the large number of approved nursing home beds referred to in the above Findings of Fact which have not yet opened, and which,

121

as time goes on, will continue to come "on line." District VIII has been established to be over-bedded by nearly 1,000 nursing home beds. The opening of these additional approved, but not yet licensed beds, will significantly increase the availability of nursing home services to DeSoto residents within their district. Indeed, the opening of some of those beds since HRS completed its free form review has caused a reduction in occupancy rates of nursing home beds in Charlotte and Sarasota Counties, adjacent to DeSoto County, down to the 80 per cent or below level (and in Highlands and Hardee Counties as well, given recently approved beds not yet on line, to the extent that those counties out of the district might be considered solely on the question of patient accessibility to nursing home beds.) HRS admittedly ignored the locally developed standard now incorporated in Rule 10-17.020(2)(b), Florida Administrative Code, effective May 14, 1984. This standard requires that 95 per cent of the residents of District VIII (including DeSoto County) should live within a one hour automobile travel time to nursing home services. The evidence of record clearly establishes that the existing nursing homes in the adjacent counties in District VIII are within "40 some miles" of DeSoto County and Arcadia, and a number of existing nursing homes and nursing homes under construction are within less than 30 minutes travel time from the center of DeSoto County (i.e. Arcadia). Indeed, Port Charlotte, which is the location of a number of immediately nearby nursing homes, is only 15 miles from the center of DeSoto County. The applicant did not present proof that the nursing homes in Sarasota County are all out in the vicinity of the beaches and beyond 50 miles or an hour's driving time, nor was proof presented that nursing home beds in the other counties in District VIII are beyond one hour's driving time, with the possible exception of the nursing homes in Collier County, which are unquestionably beyond one hour's travel time (even though it is recognized that the utilization rate in Collier County may now be as low as 64.5 per cent). The high utilization existing in the surrounding counties at the time of HRS' free form review of this application may indeed have supported approval of an additional 60 beds for DeSoto County, which would have comported with HRS actions in other cases approving more beds than called for by the bed need methodology when both a district and sub-district were experiencing high utilization rates. Significant additional nursing home beds are now available in the surrounding counties of District VIII however, and the utilization rates are now barely above, and in some cases below, the minimum required by Rule 10-5.11(21)(g)(h), Florida Administrative Code. The reduced occupancy rates in the above-discussed surrounding counties and the large number of approved additional beds for these areas of District

122

VIII, provide ample available and accessible nursing home services to residents of both DeSoto County and the district as a whole.

The application review criteria contained in Section 381.494(6)(c)1 and 2, Florida Statutes, requires consideration of the need for health care facilities and services being proposed in relation to the district health plan, and the availability, accessibility and extent of utilization of like and existing health care services in the service district of the applicant. In accordance with the district plan, embodied in Rule 10-17.020, Florida Administrative Code, these additional, accessible and available nursing home services are within one hour's travel time by automobile of the residents of DeSoto County. The accessibility standard contained in this rule was not considered by HRS when conducting its review of this application, possibly because the rule did not take effect until May 14, 1984. The rule is clearly applicable to this proceeding however, especially in view of the fact that the applicant and HRS had ample time to take the rule into account in preparing proof for this hearing, since the rule became effective several months prior to hearing. See, *Turro v. Department of Health and Rehabilitative Services*, 458 So.2d 345 (Fla. 1st DCA 1984) and *McDonald, supra*. Parenthetically it should be pointed out however, that in considering the *Turro* decision, the Hearing Officer does not consider the subject rule concerning accessibility to be merely procedural in nature. In any event, it is unlikely that these beds will be occupied by residents of counties adjacent to DeSoto County, because there is already an excess of nearly 1,000 nursing home beds coming on line in the other counties of District VIII. The approval of 60 more beds for DeSoto County, as a sub-district of District VIII, will simply create more excess beds for both the sub-district of DeSoto County and District VIII as a whole.

Subsections 381.494(6)(d) 1, 3 and 4, Florida Statutes, apply to applications for the construction of new health care facilities and require consideration of whether there are less costly and more efficient alternatives to the proposed new construction, and whether patients will experience serious problems in obtaining in-patient care in the absence of the proposed new construction. First, there is no preponderant evidence to demonstrate that the DeSoto County population requiring nursing home services will experience any significant problem in obtaining services in view of the availability of nursing home beds in surrounding counties and in District VIII as a whole. If this proposal is approved, DeSoto County itself would be over-bedded by approximately 45 nursing home beds.

There exist alternatives to the proposed construction of a new free-

123

standing nursing home facility. One alternative is to allow the nursing home beds already approved for the district to open and reach a reasonable, minimal rate of utilization before consideration of the addition of a new nursing home facility and additional beds coupled with it is considered and approved. Another alternative, not clearly precluded by statute or rule, is that of adding needed nursing home beds to the existing DeSoto Manor facility, the only existing one in DeSoto County. It is true that legally the DeSoto Manor application for additional beds cannot be considered comparatively with the instant application because it is not a competing application in view of the batching rule cited above. There is no clear prohibition, in statute or rule, however, against considering the possibility of addition of beds to DeSoto Manor's facility, however, since the statutory criteria requiring consideration of reasonable alternatives does not confine its purview to that of alternative applications in the same batch. In this connection, it is established that the addition of needed nursing home beds in the existing facility is a more efficient and cost effective means of providing services than the construction of an entire new nursing home. The administrative and other support spaces at DeSoto Manor Nursing Home were constructed originally to support a nursing home of an ultimate 120 bed size. HRS did not consider the alternative of adding new beds to DeSoto Manor in formulating the factual and legal position it exposed at hearing, because DeSoto Manor's application was simply not filed in the same batching cycle for purposes of Rule 10-5.08(1), Florida Administrative Code. that rule does not address consideration of alternatives to a proposed project which do not involve competing applications however. The provisions of law such as Section 381.494(6)(d) and Rule 10-5.11(4) and (12), which require consideration of alternatives exist, and are applicable to these proceedings separate and distinct from the body of law which requires applications filed in the same batching cycles to be comparatively reviewed as competing applications. There has been no specific provision of statute or rule provided to the Hearing Officer which precludes consideration of the expansion of the DeSoto Manor facility as an alternative, although its application to do so in another batch and another proceeding is not before this Hearing Officer for comparative review such that DeSoto Manor has proved and can become in any way entitled to a certificate of need for that expansion as a result of this proceeding.

Section 381.494(6)(c)9, Florida Statutes requires evaluation of immediate and long-term financial feasibility of a certificate of need applicant's proposed facility and services. Heritage Hall predicates its financial feasibility for constructing and operating the proposed nursing

124

home upon its projected reaching 97 per cent occupancy in the sixth month of operation, and receiving 40 per cent of its revenues from private paying patients, as opposed to revenues derived from various government entitlement programs. It must be remembered however, that only 15 beds may be added to DeSoto County before nursing home occupancy falls below the rule mandated 80 per cent. Indeed, upon addition of 60 additional beds, occupancy was shown to fall to 50 per cent. The applicant's projection which results in a total occupancy rate of 97 per cent within six months of opening its new facility, is clearly unrealistic. The applicant's projection of its share of private, paying patients does not reflect the historical experience of DeSoto County. It is more likely that the applicant's percentage of private, paying patients will be significantly less than that projected, possibly as low as one-half of that projected, based upon the experience, in evidence of DeSoto Manor's revenue sources. It was simply not established by preponderant evidence that private, paying patients will make up approximately twice the share of the revenue derived for Heritage Hall's proposed facility, as that currently being experienced by DeSoto Manor, a like 60-bed facility in essentially the same location. It is likely that Heritage Hall will be unable to attract significant numbers of patients from the coastal and surrounding counties in order to meet its projections of 97 per cent occupancy within six months and 40 per cent private, paying patients as a predicate to its financial feasibility, in view of the large numbers of approved, but yet unoccupied, beds now coming on-line in surrounding counties of District VIII.

Section 381.494(6)(c)8, Florida Statutes, requires determination of the availability of health manpower for project accomplishment and operation. Health manpower resources in DeSoto County are limited and the existing nursing home has experienced serious shortages in registered nursing personnel. Indeed, administrators of other nursing homes in District VIII have sought the assistance of the DeSoto Manor administrator in filling their staff vacancies. There appears to be little inclincation among professional nurses to travel from the more urban, coastal counties to obtain employment in the rural DeSoto County location of the parties to this case. While there is an LPN Vocational Training Program at the Vocational Technical School in Arcadia, which may alleviate the applicant's difficulty in obtaining staff to some extent, they will still be competing for those nursing program graduates with DeSoto Manor and such will do nothing to alleviate the difficulty in obtaining registered nurses and other staff members willing to either travel to or live in rural DeSoto County.

Section 381.494(6)(c)12, Florida Statutes, requires consideration of the impact of a proposed project on the cost of providing health services of the type proposed by the applicant. The charges proposed by the applicant for its nursing home services exceed by about $20 per patient, per day, the charges currently in effect in the Arcadia community and charged by DeSoto Manor. The establishment of an additional 60-bed nursing home in that community will drastically reduce revenues available to the existing nursing home, DeSoto Manor. The substantial net loss which can be expected at the existing nursing home will obviously require an increase in patient charges to make up lost revenues. The addition of a 60-bed free-standing nursing home to DeSoto County, such that there are two nursing homes with 120 beds competing for patients, will likely result in a net loss for the new nursing home as well. The cumulative effect of the addition of the 60-bed nursing home will likely result therefore, in the cost of nursing home services increasing due to attempts by the present nursing home and the applicant's, should it be licensed, to increase patient charges in order to make up for lost revenue caused by low respective occupancy levels.

Section 381.493, et seq., Florida Statutes, is an expression of the legislature's intent to attempt to ensure that health services are provided in the most cost effective manner possible and to eliminate unnecessary duplication of health care services, which itself relates to cost effectiveness and the overall level of health care costs. Approval of the Heritage Hall application was not shown to enhance cost effectiveness in the provision of nursing home services in DeSoto County, but indeed will likely cause the services to become more costly in the long run. The addition of a 60-bed nursing home will duplicate the services already available to the extent that DeSoto County would be over-bedded by 45 nursing home beds. District VIII, within which DeSoto County is located, is over-bedded by nearly 1,000 beds now. There was simply no preponderant evidence presented in this proceeding which could lead to a conclusion that the DeSoto County population which might require nursing home services, that is those persons over 65 years of age, are unable to obtain those services due to lack of availability or reasonable accessibility given the criteria of the above-cited rule, in DeSoto County or surrounding counties in District VIII. There are sufficient empty nursing home beds in District VIII, either installed or about to become available such that nursing home services are clearly, amply available to residents of District VIII at the present time without the addition of 60 beds to DeSoto County by this application.

126

Finally, it must be pointed out that although HRS recited other occasions where it approved beds in excess of those established to be needed under the above rule's methodology, the evidence adduced in support of departure from Rule 10-5.11(21) must demonstrate that there is a similarity between the circumstances in the case at bar and those circumstances attempted to be used as relevant examples of when consistent incipient agency policy justifies departure from the rule in approving excess beds. No evidence has been presented here which would justify the departure from the prohibition in Rule 10-5.11(21), especially in view of the fact that the applicant and HRS have failed to sustain their burden of establishing that the available beds and approved beds coming on line in the other counties in the district are inaccessible within the criteria of the above rule. In each of those instances, however, excess beds were approved when both the relevant sub-district and the district were experiencing occupancy rates in the neighborhood of 100 per cent, or when there was no nursing home in existence in the pertinent sub-district or in the final circumstance, when a new nursing home was approved to serve a multi-county sub-district which experienced high occupancy rates. The evidence does not reveal that HRS has approved an application for as many as 45 beds in excess of those calculated by the rule methodology for a sub-district.

## RECOMMENDATION

Having considered the foregoing Findings of Fact, Conclusions of Law, the evidence of record, the relevant legal authority, the candor and demeanor of the witnesses and the pleadings and arguments of the parties, it is, therefore

RECOMMENDED:

That the Department of Health and Rehabilitative Services enter a Final Order DENYING the application of Heritage Hall to construct a new 60-bed nursing home facility in DeSoto County, Florida.

## FINAL ORDER

This cause came on before me for the purpose of issuing a final agency order. The Hearing Officer assigned by the Division of Administrative Hearings (hereinafter referred to as "DOAH") in the above-captioned case has submitted a Recommended Order to the Department of Health and Rehabilitative Services (hereinafter referred to as "HRS"). A copy of that Recommended Order is attached hereto as Exhibit A.

Respondents, HRS, and Health Care Medical Facility XXVI, Part-

127

nership, d/b/a Heritage Hall Health Care XXVI ("Heritage Hall"), filed Joint Exceptions to the Recommended Order. Petitioner, Diversicare Corporation, Inc., d/b/a DeSoto Manor Nursing Home ("DeSoto Manor"), filed a Response to the Joint Exceptions to Recommended Order.

## RULING ON EXCEPTIONS

1. HRS's policy is to grant beds above the number computed through applying the need methodology in rural counties where residents do not have appropriate access to nursing home beds. At the time HRS made its initial determination on Heritage Hall HRS applied its policy in granting Heritage Hall's application because it appeared that there was an access problem in DeSoto County, in that the only existing nursing home has consistently experienced a very high occupancy rate. The facts adduced at the de novo hearing, nearly a year later, indicate that there is access to residents of DeSoto County seeking nursing home care, within reasonable driving time. Therefore, the policy of HRS to grant beds in rural counties where access is a problem, is inapplicable. Joint Exception number 1 is denied.

2. It is inappropriate to consider the application of Petitioner DeSoto Manor in the present proceedings. No conclusion of law concerning the application of Heritage Hall can be based on any findings of fact concerning the application of DeSoto Manor. Joint Exception 2 is granted.

3. The Hearing Officer has correctly interpreted the drive time rule contained in Rule 10-17.020(2)(b), F.A.C. The drive time rule can, in some instances, justify the grant of beds despite the fact that no need for such beds is shown under the rule need methodology. Here, the drive time rule is satisfied and so cannot overcome the low need determination. There is a need for only a small portion of the 60 beds proposed by Heritage Hall. Heritage Hall has failed to establish any extenuating circumstances which would justify the grant of a certificate of need for construction of a 60-bed nursing home despite the low need projection. Joint Exception 4 is denied.

## FINDINGS OF FACT

The Department hereby adopts and incorporates by reference the findings of fact set forth in the Recommended Order.

## CONCLUSIONS OF LAW

The Department hereby adopts and incorporates by reference the conclusions of law set forth in the Recommended Order, except page

128

20, line 20, beginning "The Administrative and other support spaces at DeSoto Manor Nursing. . ." and the remainder of the paragraph found at the bottom of page 20 and top of page 21 are deleted. Paragraph 2 on page 22 is deleted because it is not supported by the findings of fact in the Recommended Order.

It is therefore ADJUDGED that

The application of Heritage Hall to construct a new 60-bed nursing home facility in DeSoto County, Florida, is DENIED.

DONE AND ORDERED this 10th day of June, 1985, in Tallahassee, Florida.